IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CHARLES SCOTT THOMAS,            )
                                 )
                    Plaintiff    )
                                 )
        vs.                      )        Civil Action No. 07-40J
                                 )        Judge Kim R. Gibson/
PENNSYLVANIA DEPARTMENT OF       )        Magistrate Judge Amy Reynolds Hay
CORRECTIONS; CUTSHALL; OFFICER   )
EVERHART;  GREENLEAF; OFFICER    )
HARPSTER; SUPERINTENDENT         )
GEORGE PATRICK; REGIONAL         )
DEPUTY SECRETARY WILLIAM         )
STICKMAN; YOUNKIN; JOHN DOES,    )
in their individual and official capacities,  )
                                 )
                    Defendants   )
                                 )        Re: Dkt. [25]

## REPORT AND RECOMMENDATION

### RECOMMENDATION

It is recommended that Defendant Cutshsall's motion to dismiss/motion for summary

judgment, Dkt. [25],  treated as a motion for summary judgment, be granted.

### REPORT

Charles Scott Thomas ("Plaintiff") is a prisoner in the Pennsylvania Department of

Corrections ("DOC").  He also underwent an above-the-knee amputation of his left leg long prior

to coming into DOC custody.  He has filed a civil rights suit, claiming that various defendants

violated his rights under the Eighth Amendment, the Americans With Disabilities Act ("ADA"),[1]

the Rehabilitation Act[2] ("Rehab Act") and state law.  This suit arises in connection with the

---

[1] 42 U.S.C.A. § 12131 *et seq.*

[2] 29 U.S.C. § 794 *et seq.*

denial of a cell that is adapted for persons with disabilities, sometimes referred to as a "handicapped cell" (hereinafter "an adaptive cell"), and the loss by DOC of his prosthetic leg, which had been sent out for repairs, and the replacement thereof with an allegedly inferior prosthetic leg.   The complaint named as defendants several individuals who were employees of DOC, as well as DOC itself, in addition to naming an independent contractor.   The independent contractor defendant is Debra Cutshall, who worked for Prison Health Services ("PHS"), both as a clinical coordinator and program manager, both of which were administrative positions.   PHS was the company contracted by DOC to provide health care services to inmates at SCI-Houtzdale.

**Relevant Procedural History**

This case has been the subject of prior proceedings, including a report and recommendation.   Familiarity with those proceedings is presumed.   Plaintiff, represented by counsel from the Community Justice Project,  filed the instant civil rights complaint.   At the time of the filing of the complaint, Plaintiff was housed in SCI-Houtzdale.

Debra Cutshall filed a motion to dismiss/summary judgment, with evidentiary materials appended, Dkt. [25], and a brief in support.   Dkt. [22].   Plaintiff filed a response to the Motion. Dkt. [30].   Defendant Cutshall filed a sur-response.   Dkt. [32].   Plaintiff then filed a motion for leave to file a "sur-reply" to Defendant Cutshall's sur-response, Dkt. [33],[3] which motion for leave was granted by the Court, Dkt. [35], and Plaintiff's sur-reply was filed.   Dkt. [45]. Plaintiff also filed his medical records under seal.   Dkt. Nos. [36] to [41].   Defendant Cutshall then requested leave to file a sur-sur response/reply, Dkt. [42], which the Court granted, Dkt.

---

[3]  Plaintiff's proposed sur-reply accompanied Plaintiff's motion for leave to file.  Dkt. [33-2].

[43] and Cutshall's sur-sur response was filed. Dkt. [44]. Defendant Cutshall also filed a supplemental response. Dkt. [59].

**Standard of Review**

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a *genuine issue for trial*" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Electric Industrial Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), quoting Fed.R.Civ.P. 56(e). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). Thus, it must be determined "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Brown v. Grabowski, 922 F.2d 1097, 1111 (3d Cir. 1990), quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 251-52. In analyzing the record, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. McCarthy v. Recordex Serv.,Inc., 80 F.3d 842, 847 (3d Cir. 1996).

**The Factual allegations of the complaint**

The complaint alleges that Plaintiff was an above the knee amputee who had, prior to entering DOC custody, a "high- end" prosthetic leg. When he was transferred from the Allegheny County Jail to DOC custody, he was initially placed in SCI-Camp Hill in May 2004. In August 2004, Plaintiff was transferred to SCI-Houtzdale. Plaintiff's high-end prosthetic leg was lost, as was all information concerning the prosthetic leg. Accordingly, Plaintiff was directed to have a new prosthetic leg fitted and ordered. Defendant Cutshall had a role in this in that she acted as the intermediary to contact the outside vendor to come in to measure Plaintiff and make the prosthetic leg and fit Plaintiff with the new prosthetic leg.

During the time without the prosthetic leg, Plaintiff had trouble and requested an adaptive cell. Plaintiff was denied this adaptive cell.

In February 2005 Plaintiff received his new prosthetic leg which he felt was inferior to the previous high-end leg. He tried the leg for a period of time but found that it was painful, it irritated Plaintiff's scar tissue and caused him blisters. Thereafter, in May 2005, Plaintiff refused to wear the new prosthetic leg. After refusing to wear the new prosthetic leg, Plaintiff requested an adaptive cell repeatedly but was denied such.

Plaintiff alleges that the Defendants are deliberately denying Plaintiff an adaptive cell as punishment for him refusing to accept his new prosthetic leg.

The claims against Defendant Cutshall are as follows: A) in her official capacity, she is alleged to be liable under Title II of the ADA for her role in failing to replace the lost prosthetic leg with an equivalent leg (Dkt.[1] at ¶ 85) and for her role in denying Plaintiff's request for an adaptive cell (Dkt. [1] at ¶ 86); B) in her official capacity, she is alleged to be liable under the

Rehabilitation Act for her role in failing to replace the lost prosthetic leg with an equivalent leg and for her role in denying Plaintiff's request for an adaptive cell;  C) in her individual capacity, she is liable under Title V of the ADA because of her role in refusing to provide Plaintiff an adaptive cell which allegedly constituted retaliation against Plaintiff for his refusal to accept an inferior prosthetic leg, id., at ¶ 88; D) Defendant Cutshall is liable under the Eighth Amendment for her deliberate indifference to Plaintiff's medical needs by her role in allegedly delaying replacement of Plaintiff's prosthetic leg and for her role in denying Plaintiff's request for an adaptive cell,  id., at ¶¶ 89-90;  E) Defendant Cutshall is liable under the Eighth Amendment for her role in denying him an adaptive cell because such denial constituted a failure to protect a vulnerable inmate from attack, id., at ¶92 and F) Cutshall is liable for her role in a policy, custom, practice and/or procedure that resulted in all of the foregoing violations, id.,  at ¶¶ 87 & 91.

**Discussion**

Defendant Cutshall filed her motion for summary judgment that was accompanied by evidentiary materials, which established, *inter alia*, that she had no role in housing assignments for Plaintiff and hence, no role in denying his requests for an adaptive cell; that she had only a limited role in contacting the outside vendor for scheduling the measuring of and fitting of Plaintiff with the new prosthetic leg and that she had no decision making authority in the timing and designing of the new prosthetic leg.  She also adduced evidence that Plaintiff failed to name her in any administrative grievance and thus, Plaintiff procedurally defaulted his claims against Defendant Cutshall.  This was sufficient to meet her initial summary judgment burden to show a lack of a genuine issue of material fact.  Hence, the burden shifted to Plaintiff to point out in the

record evidence that created a genuine issue.

### 1. Procedural Default

In her motion for summary judgment, Defendant Cutshall appended the grievances that
Plaintiff filed concerning the issues he complains of in his complaint.  Defendant Cutshall points
out that Plaintiff failed to name her in any of the grievances and she argues that pursuant to
Spruill v. Gillis, 372 F.3d 218, 230 (3d Cir. 2004), Plaintiff has procedurally defaulted his claims
against her by this failure.  She is correct.

Pursuant to 42 U.S.C. § 1997(e)(a) of the PLRA, "[n]o action shall be brought with
respect to prison conditions under section 1983 of this title, or any other Federal law, by a
prisoner confined in any jail, prison, or other correctional facility until such administrative
remedies as are available are exhausted."  The pertinent Pennsylvania DOC  policy, establishing
what administrative remedies are available to prisoners in DOC institutions was promulgated in
DC-ADM 804.

The Court of Appeals for the Third Circuit  has declared that DC-ADM 804 requires that
the prisoner name individuals in the grievance whom he eventually sues in court in order to
exhaust under the PLRA.  In Spruill, the Court of Appeals was confronted with a situation where,
although the Pennsylvania prisoner had filed a grievance, the grievance failed to mention one of
the people whom the prisoner subsequently named as a defendant in a civil rights action based on
the same events as the grievance.   The Court held that because the grievance did not mention the
particular individual by the name of Brown, the prisoner-plaintiff had procedurally defaulted his
claims against Brown.  The holding of Spruill, in this respect is right on point:

[t]he passage quoted above regarding the contents of the grievance is also the only

section of the Grievance System Policy requiring that the grievance identify specific persons. On this matter, the text is mandatory, or nearly so: "The inmate shall include a statement of the facts relevant to the claim.... The inmate should identify any persons who may have information that could be helpful in resolving the grievance. The inmate should also include information on attempts to resolve the matter informally." DC-ADM 804, Part VI.A.1.d. To the extent that Brown's identity is a "fact[ ] relevant to the claim"-and it is-it was mandatory for Spruill to include it. To the extent that Brown was a "person[ ] who may have information" or someone with whom Spruill made "attempts to resolve the matter informally"-and he was-Spruill was required to identify Brown if practicable. Spruill did not, and has offered no explanation for his failure to do so. Any grievance against Brown would now be time-barred. See DC-ADM 804, Part VI.A.1.e ("Grievances must be submitted by the inmate ... within fifteen (15) working days after the events on which the claims are based."). Thus Spruill has procedurally defaulted a claim against Brown by failing to identify him.

Spruill, 372 F.3d at 234.

Instantly, the Defendant has pointed to evidence, showing that Plaintiff did not even mention Defendant Cutshall in any of his grievances. Accordingly, Defendant Cutshall has carried her summary judgment burden to produce evidence to show Plaintiff has failed to exhaust as to Defendant Cutshall. Ray v. Kertes, 285 F.3d 287, 293 n. 5 (3d Cir. 2002)(exhaustion is an affirmative defense which means defendants have burden of proof to establish non-exhaustion).

In response, Plaintiff produces no evidence that he in fact named Defendant Cutshall, as such, in any of the grievances. He does, however, raise several arguments.

The first argument he raises is that the "purpose of the grievance system is 'not to give personal notice to a particular official that he may be sued.'" Dkt. [30] at 5, *quoting*, Jones v. Bock, 127 S.Ct. 910, 923 (2007). However, the Bock case's statement is not applicable to this case because of the significant difference between the state of Michigan's policies on exhaustion, which were at issue in Bock, and the State of Pennsylvania's policies on exhaustion.

7

The Pennsylvania DOC regulations at DC-ADM 804, governing the exhaustion requirement in Pennsylvania state prisons, provides the yardstick by which we are required to measure exhaustion, Spruill, 372 F.3d at 231, and distinguishes this case from the Supreme Court case in Jones v. Bock, 127 S.Ct. 910, 923 (2007), wherein the court there held that failing to name the defendants in the Michigan State grievance procedure did not constitute a failure to exhaust, because there was no such requirement to do so contained in the Michigan state grievance policy nor was there any in the PLRA itself. In contrast to Pennsylvania's regulations, the State of Michigan's grievance procedure at issue in Jones v. Brock, contained no requirement to name individuals. As the Bock court noted:

> At the time each of the grievances at issue here was filed . . . , the MDOC policy did not contain any provision specifying who must be named in a grievance. MDOC's policy required only that prisoners "be as specific as possible" in their grievances, 1 App. 148, while at the same time the required forms advised them to "[b]e brief and concise." 2 id., at 1. The MDOC grievance form does not require a prisoner to identify a particular responsible party, and the respondent is not necessarily the allegedly culpable prison official, but rather an administrative official designated in the policy to respond to particular types of grievances at different levels. Supra, at 6. The grievance policy specifically provides that the grievant at Step I "shall have the opportunity to explain the grievance more completely at [an] interview, enabling the Step I respondent to gather any additional information needed to respond to the grievance." 1 App. 151. Nothing in the MDOC policy itself supports the conclusion that the grievance process was improperly invoked simply because an individual later named as a defendant was not named at the first step of the grievance process.

Bock, 127 S.Ct. at 922 .

In contrast, the Court in Spruill has already held that the Pennsylvania DOC's grievance policy does contain such a requirement to name responsible individuals and that "[t]he purpose of the regulation here is to put the prison officials on notice of the persons claimed to be guilty of wrongdoing." Spruill, 372 F.3d at 234. Hence, this case is distinguishable from Bock. But cf.

<u>Williams v. Beard</u>, 482 F.3d 637, 640 n.4 (3d Cir. 2007):

> To the extent that Hollibaugh suggests that because Williams was to implicate
> him he was entitled to notice sooner rather than later, the Supreme Court recently
> noted that "early notice to those who might later be sued ... has not been thought
> to be one of the leading purposes of the exhaustion requirement." <u>Jones v. Bock</u>,
> --- U.S. ----, ----, 127 S.Ct. 910, 923, 166 L.Ed.2d 798 (2007).

This court understands <u>Bock</u> to state that whereas Congress' intent in the PLRA's statutory

exhaustion requirement was not thought to have as one of its **leading** purposes early notice, such

a purpose may have been a subordinate purpose. Even if not a subordinate purpose of the

Congress, early notice can be a purpose of the state policy (which provides the yardstick by

which to measure exhaustion) and as <u>Spruill</u> seemed to at least imply, was such a purpose of the

DOC policy. Even if not a purpose of the DOC policy, it is clear, regardless of the purpose of the

requirement, that <u>Spruill</u> requires the prisoner-grievant-plaintiff to name in the grievance those he

eventually sues, upon pain of procedural default. <u>See</u>, <u>e.g.</u>, <u>Williams v. Pennsylvania, Dep't of</u>

<u>Corrections</u>, 146 Fed.Appx. 554, 557 (3d Cir. 2005)("his failure to identify defendants Herbert,

Street, or Smith in either of his two grievances, means that he failed to exhaust his administrative

remedies in accordance with Pennsylvania's grievance process and the PLRA.").

Contrary to Plaintiff's contention that requiring a prisoner to name persons involved or

persons with information regarding his claim whom he eventually desires to sue will not further

the purposes of the PLRA's exhaustion requirement, Dkt. [30] at 5, such a requirement

manifestly will enable a prison to address complaints prior to litigation. If the prison does not

know who was allegedly involved in the prisoner's complaint/grievance, then how is the prison

administration to know how to resolve the problem or whom to interview/investigate, without

knowing the name of the person complained about or at least a sufficient description of the persons involved, if the name is unknown to a prisoner.

Plaintiff's next argument is that Defendant Cutshall waived the procedural default because, pursuant to <u>Spruill</u>,[4] Defendant Cutshall was identified as a person responsible for confirming that Plaintiff's replacement prosthetic leg would be ready by a certain date. Dkt. [30] at 7. The evidence Plaintiff points to is a letter from Doctor Maue, who was chief of clinical services at the DOC Bureau of Health Care Services. That letter was addressed to Plaintiff and dated Feb. 9, 2005. Dkt. [30-6] at 13. Written on that letter is a handwritten note addressed to "Deb C" asking "will he [i.e., Plaintiff] have it [i.e., the prosthetic leg] in one month" signed by "Norene." Under Norene's signature is a written word "yes."[5] Plaintiff contends that this is sufficient to waive Plaintiff's procedural default by his failure to name Cutshall in any of his grievances. In doing so, Plaintiff cites to <u>Spruill</u>. <u>Spruill</u> is distinguishable because, therein, the responding officer, in the very process of responding to the grievance, named the unidentified person. Here, nowhere is Defendant Cutshall identified in the grievance process. However, Plaintiff argues that the court can look to extrinsic evidence outside of the grievance process to see if the prison waived the procedural default. In doing so, Plaintiff cites to <u>Williams v. Beard</u>, 482 F.3d 637 (3d Cir. 2007) for the proposition that a court can rely on evidence extrinsic to the

---

[4] In <u>Spruill</u>, although the Court held that the prisoner plaintiff therein procedurally defaulted his claim by not naming in the grievance one of the defendants named in the suit, the Court went onto hold that the prison system waived the default because in the initial grievance response, the responding official identified by name the individual whom the prisoner failed to name in the grievance but eventually named in the lawsuit. <u>Spruill</u>, 372 F.3d at 234.

[5] Defendant Cutshall incorrectly states that the handwritten note is from Dr. Maue. Dkt. [32] at 2 to 3.

grievance process to determine waiver.

In Williams, a prisoner had twice  warned, in writing, a defendant named Hollibaugh, who was the prisoner's unit manager, that the prisoner's cellmate posed a threat to the prisoner. The prisoner did so on October 20, 2003 and Hollibaugh responded that same date telling the prisoner to speak to the sergeant.  Williams v. Beard, No. 3:04-cv-2155 (M.D. Pa.  Dkt. 31 part 4 at 1)(available on PACER).[6]  The prisoner did so again on October 28, 2003, reminding Hollibaugh that "I have told you . . . I have to move from my celly[.]"  Id., (Dkt. 31, part 5 at 1). Hollibaugh responded that same date to the prisoner's written request.  Subsequent to this, the cellmate attacked the prisoner on October 29, 2003.  On October 30, 2003, only 10 days after the first written warning supplied by the prisoner, the prisoner filed a grievance but did not name Hollibaugh in the grievance.  Hollibaugh responded to the grievance in an "Initial Review Response," referred to by the Court as an IRR.  In that IRR, Hollibaugh, "acknowledg[ed] conversations Williams [i.e., the prisoner] had with the staff regarding the transfer request, but reject[ed] the grievance as lacking merit." Williams v. Beard, 482 F.3d at 638 - 39.   Hollibaugh also inexplicably asserted in the IRR that there was no indication of any problem prior to October 24, 2003 between the prisoner and his cellmate notwithstanding that Hollibaugh himself had signed the first writing filed by Plaintiff on October 20, 2003.  Subsequently, the prisoner sued in federal court naming as one of the defendants, Hollibaugh.  The District Court found that the prisoner had procedurally defaulted his claim against Hollibaugh because he failed to name him

---

[6]  Specifically, the prisoner wrote that "I have asked the officers on 2 to 10 to move me because me and my celly are having major problems w[h]ere we need to be moved apart.  I fear something may happen if we are not separated and I don't want to be hurt.  Please move us apart." Id.

in the grievance.  The District Court also found that the prison did not excuse the prisoner's

procedural default because "Hollibaugh in his response to the plaintiff's grievance does not

indicate that he recognizes that the plaintiff is complaining about his [i.e., Hollibaugh's]

conduct."  Williams v. Beard, 2006 WL 59334, *7 (M.D.Pa. Jan. 10, 2006).  In addition, the

District Court, in determining that the prison did not excuse Plaintiff's procedural default,

refused to consider the two writings of the prisoner signed by Hollibaugh that complained of the

prisoner's cellmate and that requested a transfer.  Id. at 8 ("in determining whether or not the

prison excused a prisoner's failure to name a defendant in his grievance we do not think it is

appropriate to consider and weigh evidence outside the grievance and grievance response.").

    The prisoner took an appeal and the Court of Appeals reversed.  The Court of Appeals

reversed the District Court on both bases.  As to the District Court's refusal to consider the two

writings, the Appellate Court held that

> it would have been appropriate for the Magistrate Judge to have considered the
> two inmate requests submitted by Williams to Hollibaugh and signed by
> Hollibaugh. The Magistrate Judge's conclusion that such extrinsic evidence,
> which was a contemporaneous part of the prison record and bore directly on the
> grievance, could not be considered for purposes of determining whether the
> procedural default should have been excused was not required by Spruill or any
> other of our precedents. Indeed, the two requests show without question that
> Hollibaugh knew of Williams's attempts to be moved because of his fear of attack
> and that, those attempts having undisputedly been rebuffed by him, he was "fairly
> within the compass" of Williams's grievance.

Williams, 482 F.3d at 640.

    Hence, we agree that we can consider evidence extrinsic to the grievance process to

determine whether the prison authorities waived the procedural default.  But we note that at the

point in time when the letter from Doctor Maue was written and at the point that Norene wrote

on that letter to Defendant Cutshall, Plaintiff had not yet received his allegedly inferior prosthetic

device. Hence, the letter/note could not at all concern the allegedly inferior prosthetic leg

because Plaintiff had not yet even received the leg in order to complain about it. Nor does the

letter/note at all concern Plaintiff's complaints about an adaptive cell. Hence, the only complaint

this letter/note might be relevant to is Plaintiff's complaint of undue delay in receiving his new

prosthetic leg. Accordingly, the only procedural default this handwritten note could have waived

would have been Plaintiff's failure to name Cutshall in any grievance concerning the delay in his

receipt of his new prosthetic leg.

However, we note that the only grievance to which Plaintiff points as satisfying the

exhaustion requirement for his prosthetic leg complaints was Dkt. [30-7] at 30 to 35 (Grievance

No. 115558). We further note that the first level grievance was dated April 23, 2005 and

complained, not of any delay in the receipt of his new prosthetic leg, but rather, complained of

the sub par quality of the new leg in comparison with the prosthetic leg lost by DOC.

The court is not persuaded that Williams v. Beard requires a finding on these facts that

we consider this extrinsic evidence or that the prison authorities waived Plaintiff's procedural

default of this particular claim of delay.

With respect to the prison's excusing the procedural default, the Court in Williams v.

Beard noted that

> [i]n the IRR, Hollibaugh identified himself as having had a conversation with
> Williams and as the "Grievance Officer," i.e. the person who would be
> approached regarding a cell change. Hollibaugh further stated that he interviewed
> the 2-10 staff when he received Williams's grievance alleging that he had been
> assaulted by his cellmate because the staff refused to move him as he had
> requested. According to Hollibaugh, no one interviewed by him acknowledged,
> nor did he himself acknowledge, that Williams had mentioned the seriousness of

the situation before the assault; indeed, they all agreed that Williams had not. This is not surprising, and it is not surprising that Hollibaugh, while admitting to a conversation with Williams, did not admit to any inaction on his part where that inaction is the very basis of the grievance. See id. at 234 ("[I]t is not to be expected that a response rejecting Spruill's grievance on the merits would identify any malfeasance on Brown's part."). Parenthetically, we note that it is undisputed that Hollibaugh received and responded to Williams's written request of October 20, 2003 asking to be moved because he feared he would be hurt, directly contradicting Hollibaugh's assertion in the IRR that there was no indication of any problem between Williams and his cellmate prior to October 24.

Williams v. Beard, 482 F.3d at 640. Apparently, in light of what Hollibaugh said in the IRR, the Court found that the "IRR evidences knowledge on the part of prison officials not only that there was a problem but that Hollibaugh was involved." Id., at 3.

Although not clear, the following is what the Appellate Court appears to refer to as the conversation with the prisoner which Hollibaugh referenced in the IRR and admitted having with the prisoner prior to the assault: "I also remember that you came into my office on Tuesday 10/28/03 and spoke to me concerning your custody level. At no time did you mention that you requested or needed a cell change." Williams v. Beard, No. 3:04-cv-2155 (M.D. Pa. Dkt. 32 part 4 at 1)(available on PACER). The Court of Appeals referenced this statement, apparently in combination with the fact that Hollibaugh signed the IRR as the grievance officer (who, as such, in the words of the Court of Appeals, was "the person who would be approached regarding a cell change") in connection with its conclusion that the prisoner's procedural default for not naming Hollibaugh should be excused under Spruill.

Williams has a unique set of facts, where a paper trail established that, contrary to Hollibaugh's assertions in the IRR, the prisoner therein did approach Hollibaugh in writing at least twice before the prisoner was attacked by his cellmate. The Court of Appeals found that the

Trial Court erred in not considering this paper trail. However, unlike the extrinsic evidence in Williams, here, Plaintiff seeks to have this court consider the extrinsic evidence of a letter written by Dr. Maue to Plaintiff, on which appeared a later handwritten note addressed to Defendant, asking Defendant whether Plaintiff would have the new prosthetic leg within a month. Obviously, this handwritten note was completed after February 9, 2005, the date whereon Dr. Maue wrote the letter but before February 25, 2005, the date whereon Plaintiff received his new prosthetic leg. Dkt. [30] at 2 n.1. In contrast to the extrinsic evidence considered by the Williams court, this handwritten note about whether Plaintiff would receive his new leg within a month that was clearly written prior to February 25, 2005, and, that concerned the timing of the receipt of the new leg, cannot be considered to constitute a "a contemporaneous part of the prison record [that] bore directly on the grievance" within the contemplation of Williams, when the grievance pointed to by Plaintiff as involving his prosthetic leg complaints, was not signed until April 23, 2005, some two months after this handwritten note and also when the handwritten note concerned the **timing** of the receipt of his new leg but the grievance concerned the loss of his first leg and the sub par quality of the new prosthetic leg. In light of these differences, the court does not find Williams requires us to consider the extrinsic evidence.

However, even if we were to consider this extrinsic evidence, we would not find that it constitutes a waiver of Plaintiff's procedural default for failing to name Defendant Cutshall in any grievance. The handwritten note was written some two months before the grievance that Plaintiff points to in satisfaction of his exhaustion requirement for his prosthetic leg complaints was written. The grievance concerned the sub par quality of his new leg, not the timing of the receipt of the new leg. We find that the mere identifying of Defendant Cutshall in the

handwritten note as being the one to inquire about the timing of the receipt of the new leg, simply insufficient as a matter of law to constitute a waiver of Plaintiff's procedural default for failing to name Cutshall in the grievance process that was not even initiated until some two months later and which concerned the quality of the new leg not the timing of the receipt of the new leg. Hence, this letter/note does not constitute a waiver of Plaintiff's procedural default.

Next, Plaintiff points to the fact that Defendant Cutshall participated in a meeting on January 16, 2007 concerning Plaintiff's prosthetic leg and cell status vis-a-vis his requests for an adaptive cell. Plaintiff claims that her mere participation in this meeting waived Plaintiff's failure to name Defendant Cutshall in the grievance process as to both his prosthetic leg complaints and his requests for an adaptive cell.

Initially we note that the meeting in which Defendant Cutshall participated did not occur until January 16, 2007. For reasons similar to the reasons that the handwritten letter did not constitute a waiver of Plaintiff's procedural default, that meeting cannot in any manner be considered a contemporaneous part of the prison record of the grievances nor can it be considered to have borne directly on the grievances given that the meeting occurred more than a year **after** the grievance process which Plaintiff points to for exhaustion of his prosthetic leg complaints was completed, Dkt. [30-7] at 30 to 35 (date of response to final appeal is August 31, 2005) and more than one year **after** the grievance process which Plaintiff points to for exhaustion of his adaptive cell complaint was completed, Dkt. [30-7] at 24 to 29 (date of response to final appeal is April 29, 2005). Hence, Defendant Cutshall's participation in a meeting over a year after the grievance process was completed, simply does not establish that the prison authorities waived Plaintiff's procedural default for failing to name Cutshall in any of those grievances

completed long before the meeting ever occurred. These factual dissimilarities between Williams v. Beard and the present case render Williams v. Beard factually distinguishable and, hence, the outcome here is not determined by the holding of Williams v. Beard. Moreover, the court concludes that, as a matter of law, participation in a meeting, long after the grievance process upon which a prisoner relies or must rely to satisfy his exhaustion requirement had been completed, simply does not constitute a waiver of the procedural default for failure to name in the grievance proceedings someone later sought to be named in a federal lawsuit. Accordingly, Defendant Cutshall's participation in the January 16, 2007 meeting does not constitute a waiver of Plaintiff's procedural default.

Plaintiff also contends that Defendant Cutshall was actually identified in the grievance review process when, in response to his first level grievance regarding the adaptive cell, the grievance review officer stated: "did speak with Medical about the status of your prosthesis. According to the Medical Department, it should be arriving by the end of January." Dkt. [30] at 9.[7] This response is aimed at explaining why Plaintiff does not need an adaptive cell, especially after he receives his new prosthetic leg. Plaintiff argues that "[s]ince Defendant was consulted in response to the letter from Dr. Maue [which this court has already found to be of no legal significance for waiver purposes], since Defendant was a part of the medical department at SCI Houtzdale, and since Defendant was the individual responsible for procuring the replacement leg, the DOC identified her in their responses to Mr. Thomas's grievances. . . ." Id.

The mere reference to the generic "Medical Department" in a response to the first level

---

[7] Although Plaintiff cites to Exhibit P, it does not appear that the initial response is included in the exhibit.

grievance, simply is not, as a matter of law, sufficient to identify Defendant Cutshall so as to

waive Plaintiff's procedural default for his failure to name her in his grievances. This is because,

it fails to adequately identify a responsible person. Cf. Spruill 372 F.3d at 222 ("[t]he purpose of

the regulation here [i.e., DOC's grievance policy requiring naming of persons with information]

is to put the prison officials on notice of the **persons** claimed to be guilty of

wrongdoing")(emphasis added); Fortune v. Bitner, 2006 WL 2796158, *9 (M.D.Pa. Sept. 25,

2006) ("The PLRA exhaustion requirement is satisfied if the Plaintiff files a grievance and

appeals the denial of the grievance to the highest level possible, giving the prison 'fair notice' of

the claim and an opportunity to remedy it. To provide fair notice of a claim, the plaintiff must

allege specific acts of mistreatment or misconduct and identify the responsible party or parties.").

Plaintiff makes similar arguments about the references to the Medical Department in the

responses to Plaintiff's grievances regarding his prosthetic leg. Again, the court considers these

generic references to the Medical Department to be insufficient as a matter of law to constitute a

waiver of Plaintiff's procedural default for failing to name Defendant Cutshall. Accordingly,

none of the reasons given by Plaintiff persuades the court that DOC waived his procedural

default when he failed to name Defendant Cutshall in any grievance.

Lastly, Plaintiff invokes the doctrine of substantial compliance to argue that because he

substantially complied with the DOC grievance policy, he did not procedurally default his claims

against Defendant Cutshall. Dkt. [30] at 10 to 11.

The parameters of the substantial compliance doctrine are not entirely clear. The first

mention of such a doctrine by the Third Circuit Court of Appeals came in Nyhuis v. Reno, 204

F.3d 65, 77-78 (3d Cir. 2000), wherein the court noted in dicta that "[w]ithout embellishing--for

the case law in the area will have to develop--we note our understanding that compliance with

the administrative remedy scheme will be satisfactory if it is substantial."  Given the case by

case development of the doctrine as envisioned by the Court of Appeals, there does not appear to

have developed clear principles for the application of the doctrine.  Ahmed v. Sromovski, 103

F.Supp.2d 838, 845 n.19 (E.D. Pa. 2000)("Caselaw applying the substantial compliance doctrine

in the PLRA context has yet to develop.").[8]  Accordingly, as the court cannot reference clearly

defined principles for the application of the doctrine, the court will mostly confine itself to

addressing the arguments of the Plaintiff for its application herein.

    First, Plaintiff argues that if we failed to find substantial compliance with the DOC

grievance policy based on Plaintiff's failure to name Cutshall during the grievance process, then

such "would result in a 'grievance review and culture marked by technicalities."  Dkt. [30] at 11,

quoting Spruill, 372 F.3d at 235.  The Court is not persuaded.   If, as has been held, that failure

to comply with the DOC's technical time requirements for grievances precludes a finding of

substantial compliance,[9] then, in this court's opinion, failure to comply with the DOC

requirement that a prisoner name names of individuals involved, precludes a finding of

substantial compliance.   In this court's opinion, requiring a prisoner to name names is much less

---

    [8] Indeed,  there appears to be some tension in the case law concerning the doctrine of substantial
compliance.  It is not entirely clear how the doctrine of substantial compliance fits with a doctrine of
procedural default as announced in Spruill v. Gillis, 372 F.3d 218, 232 (3d Cir. 2004).

    [9] See, e.g., Casey v. Smith, 71 Fed. Appx. 916 (3d Cir. 2003) (no substantial compliance where,
prior to filing suit, prisoner filed all three levels of DOC grievance/appeals, but prisoner had failed to
comply with the timing requirements for filing the first level grievance); Ahmed v. Dragovich, 297 F.3d
201 (3d Cir. 2002)(no substantial compliance where prisoner filed all three levels of DOC's
grievance/appeals, but the second and third levels were untimely filed and filed only after the federal suit
had been commenced); Ahmed v. Sromovski, 103 F.Supp.2d 838 (E.D. Pa. 2000)(no substantial
compliance even where officials had actual notice by the prisoner's filing of all three levels of grievance
system where the appeals were untimely and filed after commencement of suit).

of a "technicality" than requiring that he comply with time policies.  Accordingly, failure to name Defendant Cutshall under the facts of this case prevents the court from finding Plaintiff substantially complied as a matter of law.

Next, Plaintiff argues that because the final DOC authorities addressed his claims on the merits in the two sets of grievances and grievance appeals that Plaintiff points to as satisfying the exhaustion requirement, he has substantially complied.   Suffice it to say that notwithstanding such responses, the prison authorities had no way of knowing that Plaintiff was complaining in any way about Defendant Cutshall, given her limited role in acting as the contact for the outside vendor of the new prosthetic leg and coordinating between the outside vendor and Plaintiff.  This is even truer regarding the adaptive cell requests by Plaintiff given the utter non-role Defendant Cutshall played in that issue. Dkt. [30-5] at 17, Ex. H, Transcript at  63.[10]

In light of the record, Plaintiff has not substantially complied with the DOC administrative regulations governing grievances.   Accordingly, there is no genuine material factual dispute over whether Plaintiff has procedurally defaulted his claims against Defendant Cutshall.

### 2.  Merits

---

[10]   The following exchange took place between Defendant Cutshall and her attorney at her deposition, Dkt. [30-5] at 17, Ex. H, Transcript at  63:

Q.  Do you, either as clinical coordinator or program manager, have any role, responsibility, or authority with respect to inmate housing assignments here at SCI-Houtzdale?
**A.  Absolutely none.**
Q.  Does anybody in the medical department have the authority, or responsibility, or regulation of inmate housing here at SCI-Houtzdale?
**A.  The doctors, the PA's can make the recommendation.  The ultimate responsibility then would go back to DOC.**

In the alternative, Defendant Cutshall is entitled to summary judgment as to all of the claims on the merits.

Defendant Cutshall first points out that she cannot be held liable in her official capacity for the non-retaliation/coercion claims under the ADA and the corresponding regulations because she is not a public entity. We agree.

First, and foremost, because Cutshall is an employee of a private company, i.e. PHS, she does not have an "official" capacity. Ellibee v. Leonard, 226 Fed. Appx. 351, 357 (5th Cir. 2007) ("the record shows that the defendants were employees of private companies, not a state or local government, so the defendants had no official capacities in which they could be sued."); Tran v. Michigan Dept. of Human Services, 2007 WL 4326791, *4 (E.D.Mich. Dec. 10, 2007)(same). Sutherland v. New York State Dept. of Law, 1999 WL 314186, at *7 (S.D.N.Y. May 19, 1999)("Individual defendants may not be held personally liable for alleged violations of the ADA . . . or the Rehabilitation Act . . . . Nor can individuals be named as defendants in ADA or Rehabilitation Act suits in their official or representative capacities."); Harrison v. Indosuez, 6 F.Supp.2d 224, 229 (S.D.N.Y. 1998); Lane v. Maryhaven Center of Hope, 944 F.Supp. 158, 162-63 (E.D.N.Y. 1996).

This legal rule makes sense when one considers the purposes originally underlying the concept of official capacity lawsuits under Section 1983 and other federal anti-discrimination laws such as the ADA and the Rehab Act. See, e.g., Bakal v. Ambassador Const., 1995 WL 447784, *4 (S.D.N.Y. July 28, 1995)(explaining that "official capacity" suits were permitted against government officers because Eleventh Amendment and Sovereign Immunity barred naming the government itself as a defendant and official capacity suits permitted the fiction of

suing the officer but in reality suing the office, i.e., the government, but because private entities enjoy no such protection under the Eleventh Amendment nor under sovereign immunity, there is no need to sue employees of private companies in their "official capacity"). See also Smith v. American Intern. Group, Inc., 2002 WL 745603, *5 (S.D.N.Y. April 26, 2002) ("the better reasoned cases hold that a Title VII suit cannot be maintained against an individual employed by a private employer in his 'official capacity.'").[11, 12]

---

[11] It is on this ground that all of the cases cited by Plaintiff are distinguishable. Dkt. [23] at 3. All of the cases cited by Plaintiff which permit official capacity complaints against individuals under Title II of the ADA and/or under the Rehab Act involved officers of the state, whereas here, Defendant Cutshall is an employee of a private entity. McCarthy ex rel. Travis v. Hawkins, 381 F.3d 407, 409 (5th Cir. 2004)("We agree with the district court that state officers, sued in their official capacities for prospective relief, are proper defendants under Title II of the Americans with Disabilities Act and are not immune under the Eleventh Amendment."); Bruggeman ex rel. Bruggeman v. Blagojevich, 324 F.3d 906, 908 (7th Cir. 2003) ("Several developmentally disabled (i.e., mentally retarded) adults, residents of Illinois, sue the responsible state officials, in their official capacity, for alleged violations of the federal Medicaid statute, the Rehabilitation Act, and the Americans with Disabilities Act."); Miranda B. v. Kitzhaber, 328 F.3d 1181, 1183 (9th Cir. 2003)("Miranda B. named the Oregon Department of Human Services ('DHS'), its director, Bob Mink, and Oregon's Governor, John Kitzhaber (collectively 'the State') as defendants."); Carten v. Kent State Univ., 282 F.3d 391 (6th Cir. 2002)(suit against the state University and several of its professors called "Doctors" by the Appeals Court)(see also Carten v. Kent State Univ., No. 97-cv-02757 (N.D. Oh. Dkt. 105 at p. 1, describing the individual defendants as "several professors")); Randolph v. Rodgers, 253 F.3d 342, 344 (8th Cir. 2001)("Randolph sued the MDOC and the named prison officials in their individual and personal capacities.")(see also Randolph v. Rogers, 980 F.Supp. 1051, 1054 (E.D. Mo. 1997)(explaining in more detail that the individual defendants were all employees of the State Department of Corrections)).

[12] There is of course another line of cases that speaks of "official capacity" suits against corporate officers, acting in their capacity as corporate officers. The fundamental purpose of this line of corporate cases is a determination of whether the individuals are personally liable for their acts or whether the corporation is. See, e.g., McCarthy v. Azure, 22 F.3d 351, 360 (1st Cir. 1994) ("The ubiquity of the distinction [between official capacity and individual capacity] is a reflection of the reality that individuals in our complex society frequently act on behalf of other parties-a reality that often makes it unfair to credit or blame the actor, individually, for such acts."); Universal Tube & Rollform Equipment Corp. v. YouTube, Inc., 504 F.Supp.2d 260 (N.D.Ohio, 2007). Such a line of cases has no applicability herein as there is no allegation, nor evidence, that Defendant Cutshall is a corporate officer of PHS. Nor does such a doctrine have applicability in light of the Plaintiff's arguments that apparently seek to make **DOC** (and not PHS) liable based on suing Defendant Cutshall in her "official capacity." See, e.g., Dkt. [45] at 3 ("**Defendant Cutshall's actions not only are attributable to the state but also the tie to the state cloaks her positions with the possibility of suit in an official capacity.**"). It is indisputable on this record that Defendant Cutshall is not a corporate officer of DOC and that DOC is not a corporation.

Plaintiff next argues that the ADA covers PHS and therefore the employees of PHS. Dkt. [45] at 1 to 2. It is not entirely clear to this court that the ADA "covers" PHS because it is not clear to this court that PHS constitutes a "public entity"[13] as is required for liability under Title II of the ADA, which is the Title at issue currently.[14] However, even if the PHS constituted a "public entity" that provided services, programs or activities, it does not follow that Defendant Cutshall constitutes such and Plaintiff has already conceded as much, at least with respect to Defendant Cutshall in her individual capacity. Dkt. [24]. The court has already concluded that Defendant Cutshall has no official capacity. Hence, Defendant Cutshall is indisputably not a public entity. Moreover, even if we could conclude that under the terms of the PHS-DOC contract, PHS and its employees were bound to follow the ADA requirements (as Plaintiff argues), it does not follow from this premise that PHS and its employees thereby become liable

---

Hence, the line of cases of official capacity suits in the corporate context does not have applicability herein.

[13] This is true even if PHS can otherwise be considered to act under color of state law for purposes of Section 1983 liability. The court finds that the analysis of determining whether an entity is a "public entity" within the contemplation of Title II of the ADA to be different and distinct from the analysis of determining whether an entity acts under color of state law for Section 1983 liability such that answering one question does not necessarily answer the other question. Hoot by Hoot v. Milan Area Schools, 853 F.Supp. 243, 250 (E.D.Mich. 1994) ("However, this adjudication of the MHSAA as a state actor [under the Fourteenth Amendment] does not automatically make it a public entity. Rather, it must be an agency or instrumentality of the state.") See also Rendell-Baker v. Kohn, 457 U.S. 830, 838 (1982)("In cases under § 1983, 'under color' of law has consistently been treated as the same thing as the 'state action' required under the Fourteenth Amendment."); Bailey v. Harleysville National Bank & Trust, 188 Fed.Appx. 66, 67 (3d Cir. 2006)("To show that the defendant acted under color of state law, a litigant must establish that the defendant is a "state actor" under the Fourteenth Amendment.").

[14] 42 U.S.C.A. § 12132, i.e., Title II of the ADA provides that

Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

in federal court to prisoners under the ADA given the statutory language of Title II, which limits, as most courts have held, liability to "public entities." <u>O'Connor v. Metro Ride, Inc.</u>, 87 F.Supp.2d 894, 900 (D.Minn. 2000)("The Court finds that Metro Ride cannot be liable for money damages under Title II of the ADA, even though it may be bound by ADA requirements. Unlike the Rehab Act, the plain language of the ADA prohibits discrimination only by public entities. 42 U.S.C. § 12132. Therefore, the Court will grant Metro Ride's motion for summary judgment on Count Two.").

Plaintiff's next argument is somewhat unclear. Plaintiff contends that because respondeat superior liability is available under the ADA and the Rehab Act and because Defendant Cutshall is an agent of the state,"Defendant Cutshall must remain in the suit to establish liability against the state for her violations of federal law **and to establish the ADA and Section 504 responsibilities of other individuals who may fulfill the role of clinical coordinator or program manager in the future.**" Dkt. [45] at 3 to 4.

"Respondeat superior is a doctrine of vicarious liability based upon public policy [and] the notion that the person who benefits by the acts of the servant must pay for wrongs committed by the servant; the one held liable as master need not be at fault in any way." <u>McClelland v. Facteau</u>, 610 F.2d 693, 695 (10th Cir. 1979). First, Plaintiff has not presented adequate evidence that Defendant Cutshall is a servant of DOC such that rendering her liable will render DOC liable. There is no evidence on the record as presented by Plaintiff to support a conclusion that Defendant Cutshall was a servant of anyone other than PHS. The only evidence pointed to by Plaintiff is as follows:

Q. What about in your current position, who do you report to?

**A. Deb Younkin is the CHCA through the DOC, and her and I work closely together.**

Dkt. [30-5] at 6 (p. 17 of the Transcript). In addition, Plaintiff points to the fact that Defendant Cutshall's office was located in the same unit as the DOC medical employees at SCI Houtzdale. Viewing this evidence in a light most favorable to Plaintiff, the court concludes that no reasonable jury could find, based on this evidence, that Defendant Cutshall was a "servant" of the DOC. However, even if she were a servant of DOC, it would add nothing to Plaintiff's claim under Title II of the ADA and Section 504 of the Rehab Act because DOC is the public entity which would be liable under Title II in any event. Furthermore, DOC would be potentially liable under Section 504 of the Rehab Act since it presumably is a recipient of federal funds.[15] Furthermore, because Congress has limited liability under Title II of the ADA to public entities, and limited liability under Section 504 of the Rehab Act to recipients of federal funds, keeping Defendant Cutshall in the suit would serve no purpose because she could not be liable under those provisions,[16] even if other entities could be, and if she could not be liable, a suit against her could establish no duties on her part.

Lastly, Plaintiff mounts a public policy argument as to why Plaintiff should be able to proceed against Defendant Cutshall under Title II of the ADA in her official capacity. Essentially, Plaintiff argues that it is sound public policy to require Defendant Cutshall to be a part of this litigation process because if not, then there is no incentive for the PHS to work

---

[15] See, e.g., United States Dep't of Transp. v. Paralyzed Veterans of Am., 477 U.S. 597, 605 (1986)("Congress limited the scope of § 504 [of the Rehabilitation Act] to those who actually 'receive' federal financial assistance").

[16] See discussion below regarding Defendant Cutshall and the Rehab Act.

collaboratively with DOC. Dkt. [45] at 5. It is important to note what Plaintiff is not arguing under this public policy section. He does not appear to be arguing that we can make Defendant Cutshall personally liable (and this is because she is not a public entity nor a recipient of federal funds), rather, Plaintiff appears to be arguing that it is important to keep Defendant Cutshall as part of the litigation process. It is not clear how keeping her as part of the litigation process will be an incentive for PHS to work collaboratively with DOC. Moreover, it is not necessary for her to be a named party for her to be part of the litigation process as discovery may be had from non parties. Lastly, there continues to be an incentive for PHS to work collaboratively with DOC to assure compliance with the ADA because the contract between PHS and DOC requires such and failure to do so could constitute a breach of contract. Accordingly, the public policy argument is not persuasive and Defendant Cutshall is entitled to summary judgment as to the Title II claims under the ADA.

Next, we consider the Rehab Act claims. Defendant Cutshall specifically challenged her liability under the Rehab Act. Dkt. [25] at 12 to 13. Plaintiff conceded that he has no Rehab Act claims against Defendant Cutshall in her individual capacity. In addition, Defendant Cutshall is entitled to summary judgment as to those Rehab Act claims even in her "official capacity" because, as analyzed earlier, she possesses no "official capacity" as a mere employee of PHS. Alternatively, there is no evidence to establish that she qualifies as a program or activity receiving federal funds, as is required to establish liability under Section 504 of the Rehab Act.[17]

---

[17] Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, provides:

No otherwise qualified handicapped individual in the United States, as defined in section 706(7) of this title, shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any

See, e.g., Emerson v. Thiel College, 296 F.3d 184, 190 (3d Cir. 2002)("It is undisputed that Thiel is the recipient of federal financial assistance. Because the individual defendants [most of whom were employees of Thiel] do not receive federal aid, Emerson does not state a claim against them under the Rehabilitation Act."); Nelson v. Com. of Pennsylvania Dept. of Public Welfare, 244 F.Supp.2d 382, 389 (E.D.Pa. 2002) ("Unlike the ADA, which Congress intended to apply generally to the States and private employers, § 504 of the Rehabilitation Act applies 'only to those agencies or departments receiving federal funds, and § 504 applies only during the periods during which the funds are accepted.'")(quoting Koslow v. Commonwealth of Pennsylvania, 302 F.3d 161, 166 n. 3 (3d Cir. 2002)). Accordingly, Defendant Cutshall is entitled to summary judgment as to all of the Rehab Act claims (other than the retaliation/coercion claims which are addressed immediately below), regardless of the capacity in which she is sued, as she does not constitute a "program or activity receiving federal financial assistance."

Next, Defendant Cutshall is sued under the ADA and Rehab Act for her alleged retaliation/coercion of Plaintiff. Defendant Cutshall is alleged to have retaliated/coerced Plaintiff in violation of these laws by "deliberately denying Plaintiff Thomas a cell for people with disabilities because he is refusing an ill-fitting, prosthetic leg" and for his "refusing to accept a prosthetic leg that is not equivalent to the one lost by the DOC." Dkt. [1] at ¶¶ 71 to 72.

The sole argument raised by Defendant Cutshall with respect to these retaliation/coercion claims is that because she does not constitute a "public entity" under the ADA, nor does she qualify as a "program or activity receiving federal financial assistance," she cannot be liable for these retaliation/coercion claims. Dkt. [25] at 12 to 13. Defendant Cutshall is incorrect. Even

---

program or activity receiving Federal financial assistance....

though an individual defendant may not be liable under Title II or under Section 504 of the Rehab Act, merely because such individual defendants cannot be liable under Title II of the ADA or Section 504 of the Rehab Act, it does not follow that such individual cannot be liable under any other section of those Acts. Indeed, the law is to the contrary, and individuals may be held liable under the anti-retaliation/anti-coercion provisions of those Acts. Thomas v. Pennsylvania Dep't of Corr., 2008 WL 68628, *5 (W.D.Pa. Jan. 4, 2008) ("individual capacity suits under the provisions of the ADA and the Rehabilitation Act relating to retaliation/coercion claims are permitted.")(collecting cases).

Nevertheless, the court will recommend sua sponte grant of summary judgment in favor of Defendant Cutshall on the retaliation/coercion claims against her.[18] In order to show that Defendant Cutshall attempted to coerce or to retaliate against Plaintiff for his actions, the Plaintiff alleges that she played a role in denying him a handicapped cell. As one court has explained in Proctor v. United Parcel Service, 502 F.3d 1200, 1208 & n.4 (10th Cir. 2007):

In order to establish a prima facie case of retaliation, Mr. Proctor must show: "(1)

---

[18] A District Court has the inherent authority to grant summary judgment sua sponte so long as the party opposing summary judgment has notice and an opportunity to be heard concerning the proposed basis for the sua sponte grant of summary judgment. Canell v. Bradshaw, 97 F.3d 1458, at **5 (Table, Text available in Westlaw) (9th Cir. 1996) (unpublished) ("A district court may grant summary judgment to a non-moving party sua sponte so long as the other party has had an adequate opportunity to address the relevant issues."). See also Celotex, 477 U.S. at 326 ("Our conclusion is bolstered by the fact that district courts are widely acknowledged to possess the power to enter summary judgments sua sponte, so long as the losing party was on notice that she had to come forward with all of her evidence."). This report and recommendation can serve as the necessary notice; and the opportunity to object, provides Plaintiff with the opportunity to be heard with respect to this issue. Magouirk v. Phillips, 144 F.3d 348, 359 (5th Cir. 1998) ("Here, the Magistrate Judge's Memorandum and Recommendation placed Magouirk on notice that procedural default was a potentially dispositive issue with respect to three of his claims. Magouirk responded to the Magistrate Judge's sua sponte invocation of procedural default within the ten-day time period allowed for filing objections to the report. Thus, Magouirk was afforded both notice and a reasonable opportunity to oppose application of the procedural default doctrine in the district court."); Canady v. Baker, 142 F.3d 432 (Table), 1998 WL 123996, *1 (6th Cir. 1998)(same).

that he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action."

Instantly, we find that Plaintiff fails to show a material factual dispute as to the third prong of causal connection. First, we must acknowledge that if the claimed retaliation/coercion is for Plaintiff's refusing the prosthetic leg, such refusal did not occur until sometime after February 25, 2005, the date whereon he first received the new prosthetic leg. See Dkt. [30] at 2 n.1. Indeed, it appears that Plaintiff did not definitively refuse the new leg until May 20, 2005, after adjustments had been made to the prosthetic leg. Dkt. [30-5] at 12, Exhibit H at transcript pp. 41 to 42; and id., at 16, transcript p. 58, lines 7 to 10 Hence, as a matter of logic and causation, only actions taken after May 20, 2005 can be legitimately said to constitute retaliation/coercion for such refusal.

Defendant Cutshall presented evidence that she had no authority to obtain or order an adaptive cell for Plaintiff. Dkt. [25-6] at 2. See also Dkt. [30-5] at 17, Ex. H at transcript pp. 63 to 64. In view of this evidence, the mere failure of Plaintiff to have obtained an adaptive cell could not be the retaliatory action, as least with respect to Defendant Cutshall, because there would be no causal connection between Defendant Cutshall's acts and Plaintiff's not obtaining the cell given Defendant Cutshall's lack of authority to order that Plaintiff receive an adaptive cell.

Plaintiff's next argument is as follows: There is a DOC policy which provides that "[a]ny observing staff member can make a request on behalf of an inmate" for a reasonable accommodation. Dkt. [30] at 14. Plaintiff provides evidence that he told Defendant Cutshall of

his need for an adaptive cell numerous times. Dkt. [30], Appx. 1, Ex. A at ¶ 22.  He also attested

that "Defendant Cutshall did not assist me in obtaining a[n adaptive] cell."  Id., at ¶ 25. Plaintiff

posits that Defendant Cutshall's failure to abide by the DOC policy permitting any staff member

to make a request for an accommodation constituted a retaliatory/coercive action on the part of

Defendant Cutshall due to Plaintiff's refusal to accept the prosthetic leg.

      In order for some action to constitute a retaliatory/coercive  action, there must, as a matter

of logic, be some intent on the part of the actor allegedly retaliating/coercing.[19]  Here, the alleged

retaliatory/coercive action of Defendant Cutshall consisted of her failure to abide by a DOC

policy permitting any staff member to request an accommodation for an inmate.  However,  the

evidence of record is that Defendant Cutshall did not know of the policy.  Dkt. [30-5] at 13, Ex.

H at Transcript  pp. 47 - 48.   In fact, the evidence of record is that Defendant Cutshall believed

that she had **no** authority over the cell assignment of an inmate.  Id.,  at 17,  Ex. H at Transcript

p. 63.  So the evidence of record is that  Defendant Cutshall failed to do something, i.e., failed to

request a handicapped cell for Plaintiff, which, all the evidence of record establishes, she

believed she could not do.

      Viewing this evidence in a light most favorable to Plaintiff, the court has no hesitancy in

---

[19]  See Damm v. Rubin,  2007 WL 1741743, *2 (W.D.La. June 12, 2007)("plaintiff has failed to
state a claim for retaliation which requires [a] showing of (1) a specific constitutional right, (2) the
defendant's intent to retaliate against the prisoner for his or her exercise of that right, (3) a retaliatory
adverse act, and (4) causation"); Marcelin v. Eckerd Corp. of Florida, Inc., NO. 8:04-CV-491-T-17MAP,
2006 WL 923745, *9, n.2 (M.D.Fla. April 10, 2006 )("Because the gravamen of a retaliation claim
requires that an employer act with intent, i.e., be aware of the employee's protected conduct before the
adverse action is taken, Plaintiff cannot demonstrate, as a matter of law, that he engaged in protected
participation conduct.");  Jones v. School Bd. of Orange County, Fla., 2005 WL 1705504, *8 (M.D.Fla.
July 20, 2005)("A government official's intent is a critical element with regard to a First Amendment
retaliation claim.  Retaliation requires actual knowledge and real intent, not merely constructive
knowledge and assumed intent.")(citations omitted).

concluding that no reasonable jury could find for Plaintiff on this retaliation/coercion claim because there is no evidence that failure to act as Plaintiff wanted her to was motivated by an intent to coerce/retaliate,where Defendant Cutshall believed she could not act as Plaintiff wanted her to. Plaintiff fails to adduce evidence of the third prong of his retaliation claim, i.e., causation. For all that this record shows, Defendant Cutshall failed to abide by this policy or, even more broadly, failed to assist Plaintiff in obtaining an adaptive cell, not because of Plaintiff's refusal to accept his new prosthetic leg but because she believed, even if erroneously, that she had no authority to offer such assistance. Defendant Cutshall's failure to act in this regard is no more retaliatory than her failure to act to obtain an exemption for Plaintiff from standing for the count when the evidence shows she believed she had no authority to do so. Dkt. [30-8] at 14 (Plaintiff's request to Defendant seeking exemption from the count and her response indicating she had no authority to grant such an exemption). Accordingly, summary judgment should be granted to Defendant Cutshall on Plaintiff's retaliation/coercion claims under the ADA and the Rehab Act.

Lastly, Plaintiff makes two Eighth Amendment claims against Defendant Cutshall. The first claim is that Defendant Cutshall was deliberately indifferent to Plaintiff by delaying the receipt of Plaintiff's new prosthetic leg, Dkt. [1] at ¶ 89, and by refusing Plaintiff's request for an adaptive cell, id., ¶ 90. The second claim is that Defendant Cutshall violated the Eighth Amendment by failing to protect Plaintiff from the risk of attack at the hands of other inmates by denying Plaintiff an adaptive cell.

In order to

make out a claim under Section 1983, a plaintiff must demonstrate that the

conduct of which he is complaining has been committed under color of state or territorial law and that it operated to deny him a right or rights secured by the Constitution and laws of the United States. The plaintiff must also establish that it was the acts of the defendant which caused the constitutional deprivation.

Mosley v. Yaletsko, 275 F.Supp.2d 608, 613 (E.D.Pa. 2003)(citations omitted).  See also

Hamilton v. Leavy, 117 F.3d 742, 746 (3d Cir. 1997)( In order "to survive summary judgment on

an Eighth Amendment claim asserted under 42 U.S.C. § 1983, a plaintiff is required to produce

sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate

indifference to that risk; and (3) causation.").   In addition, the Court has held that "deliberate

indifference" in violation of the Eighth amendment occurs when a prison "official knows of and

disregards an excessive risk to inmate health or safety; the official must both be aware of facts

from which the inference could be drawn that a substantial risk of serious harm exists and he

must also draw the inference."  Farmer v. Brennan, 511 U.S. 825, 837 (1994).   As a corollary of

the deliberate indifference standard, mere negligence by prison staff and officials is not sufficient

to state an Eighth Amendment violation.  Estelle, 429 U.S. 97, 105-06 (1976).  Further, mere

delay in medical treatment without more is insufficient to state a claim of deliberate medical

indifference. Shapley v. Nevada Bd. of State Prison Com'rs, 766 F.2d 404, 408 (9th  Cir. 1985).

In light of the uncontroverted evidence that Defendant Cutshall had no authority to grant

Plaintiff an adaptive cell and in light of the lack of evidence that even if Defendant Cutshall had

recommended Plaintiff for an adaptive cell, that Plaintiff would then have necessarily received

such a cell,[20] there is no evidence of record that Defendant Cutshall's actions or inactions had any

---

[20]  In fact, Plaintiff provided evidence that a physician assistant had ordered Plaintiff to have an adaptive cell, Dkt. [30-7] at 23, and Plaintiff then alleged that despite this medical order, such was countermanded by a non medical DOC official.  Dkt. [1] at ¶¶ 36 to 38.

causal relationship to Plaintiff not obtaining an adaptive cell. Hence, because there is no evidence that Defendant Cutshall caused Plaintiff to not receive an adaptive cell, summary judgment should be granted to Defendant Cutshall on Plaintiff's failure to protect claim and the deliberate indifference claim based on the lack of an adaptive cell.

That leaves only Plaintiff's Eighth Amendment claim of deliberate indifference due to the alleged delay of Plaintiff receiving his new prosthetic leg.

Plaintiff argues that "Defendant was also aware of physician orders for repair or replacement of Mr. Thomas' prosthetic leg, and as a nurse, she was certainly aware of the physical difficulties and potential for falls . . . with one leg during his day to day life." Dkt. [30] at 17. As Plaintiff correctly notes, an "unreasonable delay in rendering medical treatment can be evidence of deliberate indifference." Dkt. [30] at 18. However, we must focus on the delay that occurred herein and determine whether there is a genuine factual dispute as to the reasonableness *vel non* of that delay.

Defendant Cutshall could not have been responsible for any delay prior to August 23, 2004, the date whereon Plaintiff arrived at SCI-Houtzdale.[21] Plaintiff received his new prosthetic leg on February 25, 2005. Dkt. [38] at 6. Hence, at most we are talking about a delay from August 23, 2004 until February 25, 2005 a "delay" of six months.

Plaintiff first argues that a Doctor Lasky of SCI-Camp Hill had ordered on August 12, 2004 repair of Plaintiff's old prosthetic leg (i.e., the one that was lost). Plaintiff also asserts that in a later fax reply to Dr. Lasky's order it was indicated that the prosthetic device was beyond repair and a new evaluation would need to be done. Dkt. [30] at 15. Plaintiff contends that

---

[21] Dkt. [30-2], Ex. A at ¶13.

these records were included in Plaintiff's medical records when he was transferred to SCI-Houtzdale and that Defendant Cutshall was the medical Department Clinical Coordinator and the person in charge of reviewing consult referrals and coordinating appropriate appointments. However, Plaintiff argues that despite the consultation order of Dr. Lasky, Defendant Cutshall took no action to secure the treatment ordered. Plaintiff points to this as evidence of deliberate indifference.

There are several flaws in this argument. Among them is that there is no evidence that Defendant Cutshall actually saw this order. Hence, absent actual knowledge of this order, there can be no subjective mindset evidencing deliberate indifference. While she may have had a duty to check these records upon his transfer, and hence, perhaps, she should have known of the orders, mere failure to abide by a duty constitutes negligence not deliberate indifference.[22]

Moreover, even if she had seen the order, the record indicates that the Utilization Review process approved only an unspecified alternative treatment plan. Dkt. [30-6] at 10, Ex. CC, attached to Ex. H (Cutshall's deposition). The record does not indicate what this alternative treatment plan was nor what actions were required on the part of Defendant Cutshall in response to such.[23]

Plaintiff complains that rather than act on such an unspecified alternative treatment plan, Defendant Cutshall waited until October 4, 2004 when she received an order from a Doctor at

---

[22] See e.g., Farmer v. Brennan, 511 U.S. at 860 (Thomas, J. concurring)("Petitioner's suggested "should have known" standard is nothing but a negligence standard").

[23] Although Plaintiff points to several different versions of the consult form, none of them except the one cited above had a Utilization Review approval, which the record indicates was a requirement before Ms. Cutshall could act. See Dkt. [30–5] at 4, Ex. H, transcript p. at 9; [30-5] at 8 to 9.

SCI-Houtzdale for an outside consultant to come in and measure Plaintiff for a new prosthetic leg in order to take any action. Thereafter, Plaintiff complains that Defendant Cutshall only scheduled the initial appointment with the outside consultant on October 25, 2004. Dkt. [30] at 16. There is no evidence of record as to why it took roughly 11 calendar days for the outside consultant to come to see Plaintiff, nor could any reasonable jury conclude that this time period constituted evidence of deliberate indifference. Subsequently, Michael Veroski, the prosthetic technician came on October 25, 2004 and evaluated Plaintiff for a new prosthetic leg and noted on the consult form that the technician "will submit a proposal and wait for the o.k. to make it." Dkt. [30-6] at 12.

Thereafter, the record is silent as to what occurred until January 3, 2005, when Defendant Cutshall contacted Mr. Veroski to inquire as to what was happening with Plaintiff's prosthetic leg and Defendant Cutshall was informed that the prosthetic leg should be ready by end of January 2005. Dkt. [38] at 6. Plaintiff points to this delay (i.e., from October 25, 2004 to January 3, 2005) as being evidence of deliberate indifference. In the absence of any evidence that Defendant Cutshall knew that Plaintiff was suffering during this time period or experiencing difficulties that were not being addressed, and there is no evidence of such during the relevant time frame,[24] there simply is no evidence to support a finding that Defendant Cutshall possessed

_____

[24] For a portion of this time frame, i.e., from September 7, 2004 until November 4, 2004, Plaintiff was housed in an adaptive cell. Dkt. [1] at ¶ 33. Moreover, as of October 25, 2004 or so, Plaintiff was given crutches to help him ambulate. Dkt. [1] at ¶ 32. While Plaintiff does attest that he "told Defendant Cutshall of my need for a cell for people with disabilities multiple times" Dkt. 1 at ¶ 22, he does not indicate when he did so, but even if he had done so during these 70 days, given the fact that Plaintiff had been housed in an adaptive cell and/or had been given accommodations such as crutches, which enabled him to ambulate, Defendant Cutshall's failure to call before 70 days cannot be deemed deliberate indifference on this record by any reasonable jury because Plaintiff's lack of a prosthetic leg was being addressed even if those means of redressing the lack were not as efficacious as having a prosthetic leg.

the requisite mindset for establishing deliberate indifference. See, e.g., Edwards v. Department of Corrections, 2006 WL 2255525, *9 (E.D.Cal. Aug. 7, 2006) (holding that a delay from "September of 2003 to May 2004, of some eight months between the measurement and recommendation or approval of the hand brace until plaintiff's actual receipt of the hand brace with finger extensions" did not constitute deliberate indifference where "[a]ccording to the only expert to weigh in on the matter, defendant himself, the delay was short, plaintiff was not thereby injured and, in any event, he (defendant) was not responsible for the delay").

In fact, that Ms. Cutshall made the call indicates that she was not deliberately indifferent to Plaintiff's needs; she was in fact monitoring the situation and aware of the time passage. Furthermore, that she waited 70 days from the time Plaintiff was first evaluated by Mr. Veroski cannot by itself be sufficient evidence of deliberate indifference absent evidence that she was aware of Plaintiff's difficulties and absent evidence of how long on average it takes for Mr. Veroski to write up a proposal, along with the cost and then how long it takes to obtain approval from SCI-Camp Hill. See Dkt. [30-5] at 4, Ex. H Transcript at p. 12 (explaining process), a process that Defendant Cutshall had nothing to do with. Id. Morever, there is no evidence of record to show when Defendant Cutshall became aware of the fact that SCI-Camp Hill had indeed approved the proposal by Mr. Veroski. The court concludes that 70 days does not on this record constitute such an unreasonable delay so as to evidence deliberate indifference on the part of Defendant Cutshall. Morever, just 11 days after the January 3, 2005 call was made by Defendant Cutshall, Mr. Veroski then came to SCI-Houtzdale on January 14, 2005, to cast and measure Plaintiff for the prosthetic leg. Id. Furthermore, any delay after January 15, 2005, appears to be merely incidental to the requirements for making and adjusting the prosthetic

device. On February 18, 2005, Mr. Veroski brought the prosthetic leg back and fitted Plaintiff with the leg and informed Plaintiff and/or Defendant Cutshall that the leg should be ready in one to two weeks. Id. On February 25, 2005, the prosthetic leg was provided to Plaintiff. Id. On this record, no reasonable jury could conclude that Defendant Cutshall possessed the requisite subjective mindset so as to constitute deliberate indifference on her part as to Plaintiff's need for a prosthetic device. Moreover, in light of the fact that Plaintiff had received crutches to help him ambulate and that he was in an adaptive cell for 2 of the 6 months of delay, the delay of 70 days between October 25, 2004 and January 3, 2005 (whereon Cutshall made the call to Veroski) or even the delay of six months from August 2004 to February 2005, when Plaintiff finally received his prosthetic leg, is not significantly probative within the contemplation of Anderson, 477 U.S. at 249-50, to evidence a sufficient deprivation to satisfy the objective prong of an Eighth Amendment claim. Nor on this record, is the evidence significantly probative of the subjective mindset on the part of Defendant Cutshall to constitute deliberate indifference. Accordingly, she is entitled to summary judgment on this claim as well.

In the alternative, Defendant Cutshall would be entitled to summary judgment as to this claim based on the defense of qualified immunity. This is so because it would not have been clear to a reasonable person in Defendant Cutshall's shoes that the delay of 70 days before she made the call to Veroski, or even the delay of six months before Plaintiff received his new leg, as Plaintiff counts the delay, violated Plaintiff's clearly established constitutional rights. See Curley v. Klem, 278 F.3d 271, 277 (3d Cir. 2002)(explaining qualified immunity), *abrogation on other grounds as recognized in*, Curley v. Klem, 499 F.3d 199 (3d Cir. 2007). See also Edwards v. Department of Corrections, 2006 WL 2255525 at *9 (holding that a delay from "September of

2003 to May 2004, of some eight months between the measurement and recommendation or approval of the hand brace until plaintiff's actual receipt of the hand brace with finger extensions" did not constitute deliberate indifference).

Lastly, to the extent that Plaintiff sought to hold Defendant Cutshall liable as a policy maker, there is no evidence that she is a policy maker. In addition, she is entitled to summary judgment on any policy claim for the reasons given by Defendant in Dkt. [22] at 12 (citing Monell v. New York City, Dept. Of Soc. Serv., 436 U.S. 658 (1978)), i.e., pleading a policy, custom or practice is really a means of attempting to invoke municipal liability, not a means for imposing individual liability.

For all of the foregoing reasons, summary judgment should be granted to Defendant Cutshall.

## CONCLUSION

In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) & (C), and Local Rule 72.1.4 B, the parties are permitted to file written objections and responses thereto in accordance with the schedule established in the docket entry reflecting the filing of this Report and Recommendation. Failure to timely file objections may constitute waiver of any appellate rights.

Respectfully submitted,

/s/ *Amy Reynolds Hay*
United States Magistrate Judge

Dated: 27 February, 2008

cc: The Honorable Kim R. Gibson
United States District Judge

All counsel of record via CM-ECF