IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CHARLES SCOTT THOMAS,            )
                                 )
            Plaintiff,           )
                                 )
     vs.                         )        Civil Action No. 07-40J
                                 )        Judge Kim R. Gibson/
PENNSYLVANIA DEPARTMENT OF       )        Magistrate Judge Amy Reynolds Hay
CORRECTIONS; CUTSHALL; OFFICER   )
EVERHART; GREENLEAF; OFFICER     )
HARPSTER; SUPERINTENDENT         )
GEORGE PATRICK; REGIONAL         )
DEPUTY SECRETARY WILLIAM         )
STICKMAN; YOUNKIN; JOHN DOES,    )
in their individual and official capacities, )
                                 )
            Defendants.          )
                                 )

REPORT AND RECOMMENDATION

I.      RECOMMENDATION

        Plaintiff Charles Scott Thomas ("plaintiff") is an above-the-knee amputee and a

prisoner in the Pennsylvania Department of Corrections ("DOC"). He has filed this civil rights

action pursuant to 42 U.S.C. § 1983 claiming that defendants violated his rights under the Eighth

Amendment, the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12132, 12203, Section

504 of the Rehabilitation Act of 1973 ("RA"), 29 U.S.C. §§ 794, *et seq.*, as well as state law, by

denying him a handicap cell that is adapted for persons with disabilities and, after losing his

prosthetic leg, replacing it with an inferior model. Presently before the court is defendants'

motion for summary judgment wherein they argue that they are immune from suit under the

Eleventh Amendment and that the record is otherwise devoid of evidence to create a genuine

issue on plaintiff's claims brought under the Eighth Amendment, the ADA or the RA.

Defendants also argue that because they are entitled to summary judgment on all of plaintiff's

federal claims, the court should decline to exercise supplemental jurisdiction over plaintiff's state law claims. For the reasons that follow, it is respectfully recommended that defendants' motion for summary judgment [Dkt. 73] be granted.

II.     REPORT

    A.     Factual and Procedural Background

Plaintiff was transferred to the State Correctional Institution at Camp Hill ("SCICH") from the Allegheny County Jail ("ACJ"), in May of 2004. Shortly thereafter, plaintiff was informed that his prosthetic leg, which was not in his possession during the transfer, was in need of repairs which SCICH would arrange to have done. Plaintiff was subsequently transferred to the State Correctional Institution at Houtzdale ("SCIH") on August 23, 2004, and on September 21, 2004, plaintiff was informed that his prosthetic leg could not be repaired and that he would be provided with a new prosthesis. In the interim, plaintiff was provided with crutches and, on September 7, 2004, was placed in a handicap cell.

Plaintiff was referred for a consult with an outside orthopedic appliance vendor and fitted for a new prosthetic leg on October 25, 2004. Although he had not yet received his new prosthetic leg, plaintiff was removed from the handicap cell on November 4, 2004, and placed in a non-handicap cell. Plaintiff's subsequent requests to be returned to a handicap cell, where there were hand rails to assist him, were denied. Although it appears that a physician's assistant ordered that plaintiff be placed in a handicap cell on December 20, 2004, he withdrew the order after being informed that a handicap cell was not available and that a non-handicap cell was suitable.

At some point in late 2004 or early 2005, plaintiff was informed that his old prosthesis had been lost by the DOC. Plaintiff nevertheless received his new prosthetic leg in

February of 2005. The new prosthesis, however, differed from his old prosthesis in that it had a slip socket and belt system instead of an S and S hydraulic joint with locking lever and vacuum socket, and caused plaintiff pain. Plaintiff also complained that he had difficulty walking down grades and on uneven surfaces. Consequently, plaintiff refused the new prosthesis and again requested that he be placed in a handicap cell. That request was again denied.

Thereafter, on December 18, 2005, plaintiff alleges that he was attacked in his cell and, on June 7, 2006, he fell and hurt his back. A meeting was apparently held on January 16, 2007, to discuss plaintiff's need for a handicap cell and was concluded without that assignment being made.

It also appears that during inclement weather plaintiff had to be carried to the dining hall due to the wet and slippery conditions and, although an earlier request had been denied, plaintiff was issued a wheelchair to use in inclement weather on January 25, 2007.

Plaintiff, who is represented by counsel, filed the instant complaint on February 23, 2007, bringing claims against the DOC; Jerry L. Everhart, plaintiff's Unit Manager; Craig Harpster, another of plaintiff's Unit Managers; Norene Greenleaf, the Corrections Health Care Administrator at SCIH; George Patrick, the Superintendent of SCIH; William Stickman, the Regional Deputy Secretary for the Western Region; and Debra Younkin, the Acting Corrections Health Care Administrator at SCIH.[1] Plaintiff alleges that defendants denied him meaningful access to exercise equipment, job opportunities, and prison dining facilities and deprived him of the benefit of those prison programs, services and activities by failing to replace plaintiff's old prosthesis with an equivalent prosthesis in violation of the ADA and the RA; that defendants

_____

[1] Deb Cutshall, a program manager employed by Prison Health Services, which was the private independent contractor hired to provide medical services, was also named as a defendant but has since been dismissed from the case pursuant to a motion to dismiss. See Dkts. 62, 63.

violated the ADA and RA by refusing to place him in a handicap cell which denied him meaningful access to the toilet, sink, and shower, interfered with his ability to dress himself and posed a threat of serious harm; that defendants further violated the ADA by failing to accommodate him with a handicap cell in retaliation for refusing to accept the new prosthetic leg;[2] that defendants acted with deliberate indifference to his medical needs by delaying the replacement of his prosthesis and by refusing his requests for a handicap cell in violation of the Eighth Amendment; that defendants' policy, custom, practice and/or procedure of assigning cells to disabled inmates further violated the Eighth Amendment; and that defendants Everhart, Greenleaf, Patrick, Stickman and Younkin failed to protect plaintiff from physical injury at the hands of other inmates in violation of the Eighth Amendment by denying his request for a handicap cell.  Complaint ¶¶ 85-92.

Plaintiff also brings state law claims of common law bailment and common law conversion and/or negligent dispossession against the DOC for losing his old prosthesis.  Id. at ¶¶ 93, 94.

Plaintiff seeks a declaratory judgment that his constitutional rights were violated, compensatory damages, punitive damages, and costs, fees and litigation expenses as well as any other relief that is warranted.  Id. at ¶ 95.

B.      Standard of Review

Summary judgment is warranted only where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P.

---

[2]Plaintiff also brought non-retaliation and non-coercion claims under the ADA and RA against the defendants in their individual capacity but subsequently moved to withdraw those claims.  See Dkts. 24, 50.

56(c). The moving party bears the initial burden of demonstrating to the court that there is an absence of evidence to support the non-moving party's case. Celotex Corporation v. Catrett, 477 U.S. 317, 322 (1986). See Conoshenti v. Public Service Electric & Gas Company, 364 F.3d 135, 140 (3d Cir. 2004). When the moving party has met this burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). The mere existence of some evidence favoring the non-moving party, however, will not defeat the motion. There must be enough evidence with respect to a particular issue to enable a reasonable jury to find in favor of the non-moving party. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). See McGreevy v. Stroup, 413 F.3d 359, 363-64 (3d Cir. 2005). In evaluating the evidence at the summary judgment stage, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. Matreale v. New Jersey Dept. of Military & Veterans Affairs, 487 F.3d 150, 152 (3d Cir. 2007), cert. denied, ___ U.S. ___, 128 S. Ct. 899 (2008).

C.     Discussion

Defendants first argue that the individual defendants are entitled to summary judgment on all of plaintiff's federal claims because they are protected under the Eleventh Amendment.

Under the Eleventh Amendment, states are generally immune from suit brought in federal court by private parties.[3] Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 100 (1984); A.W. v. Jersey City Public Schools, 341 F.3d 234, 238 (3d Cir. 2003). "This

---

[3]The Eleventh Amendment provides that: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

protection from suit extends to state agencies as well as state officials sued in their official capacities for monetary damages." Id. Cf. Koslow v. Commonwealth of Pennsylvania, 302 F.3d 161, 178-79 (3d Cir. 2002) ("The Eleventh Amendment has not been interpreted to bar a plaintiff's ability to seek prospective relief against state officials for violations of federal law"). Monetary damages may be sought, however, in a suit brought against state officials in their individual or personal capacities. Lattaker v. Rendell, 269 Fed. Appx. 230, 232 (3d Cir.), cert. denied, ___ U.S. ___, 129 S. Ct. 209 (2008); Laskaris v. Thornburgh, 661 F.2d 23, 26 (3d Cir. 1981); Heffner v. Murphy, 590 F. Supp. 2d 710, 721 (M.D. Pa. 2008).

Defendants contend that, despite plaintiff's assertion that he is bringing suit against defendants in their individual capacities, the allegations in the complaint revolve around actions taken in their official capacities and, thus, they are entitled to immunity.

Defendants' argument, however, appears to misconstrue the distinction between an "official-capacity suit" and a "personal-capacity suit." The phrase "acting in their official capacity" does not refer to the capacity in which the officer inflicts the alleged injury, but rather refers only to the capacity in which the government official is being sued. Hafer v. Melo, 502 U.S. 21, 26 (1991). An "official capacity suit" is merely another way of pleading an action against an entity of which an officer is an agent, while a "personal capacity suit" seeks to impose individual liability upon a government officer for actions taken under color of state law. Id. at 25. "[O]fficers sued in their personal capacity come to court as individuals" regardless of the nature of their actions and do not, as in official capacity suits, assume the identity of the government that employs them. Id. at 27.

Thus, regardless of whether defendants were acting within the scope of their employment, they have nevertheless been sued, at least in part, as individuals and, in that capacity, are not entitled to immunity under the Eleventh Amendment.

Defendants also argue that defendant Stickman is entitled to summary judgment because plaintiff has failed to establish that he was personally involved in or had any knowledge of the alleged misconduct.  See Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005), quoting Rode v. Dellariciprete, 845 F.2d 1195, 1207 (3d Cir. 1988) ("A[n individual government] defendant in a civil rights action must have personal involvement in the alleged wrongdoing; liability cannot be predicated solely on the operation of respondeat superior").

Although in his counterstatement of material facts, plaintiff takes issue with defendants' representation that plaintiff has failed to plead, and is unable to prove, that Stickman had contemporaneous knowledge of or acquiesced to the conduct complained of, plaintiff has not addressed this issue at all in his responsive brief and, thus, has seemingly conceded the issue. See Dkt. 83, ¶¶ 57, 58.  See also Ankele v. Hambrick, 286 F. Supp. 2d 485, 496 (E.D. Pa. 2003), aff'd, 136 Fed. Appx. 551 (3d Cir. 2005); McHenry v. County of Delaware, 2005 WL 2789182 at *13 n.12 (E.D. Pa. Oct. 24, 2005).  Indeed, as argued by defendants, the only reference to Stickman in the complaint is in the section identifying him as a party wherein it states that Stickman was "responsible for reviewing the decision rendered by SCI Houtzdale's CHCA, and for insuring policies in compliance with the ADA."  Complaint ¶ 11. Whether or not these responsibilities fell within Stickman's job description as the Regional Deputy Secretary for the Western Region, however, does not in and of itself demonstrate that he was personally involved in or had personal knowledge of the actions complained of by plaintiff.  Plaintiff's failure to

point to any evidence suggesting that Stickman was, in fact, personally involved in the alleged misconduct is fatal to his claims.

Defendants also seek summary judgment on plaintiff's claims of failure to protect and deliberate indifference brought under the Eighth Amendment.

> For an inmate to prevail on an Eighth Amendment failure-to-protect claim, two requirements must be met. First, the prisoner must demonstrate "that he is incarcerated under conditions posing a substantial risk of serious harm." [*Farmer v. Brennan*, 511 U.S. 825, 834 (1994)]. This element is satisfied when the alleged "punishment" is "objectively sufficiently serious." *Id.* Second, the prison officials involved must have a sufficiently culpable state of mind. *Id.* at 838

Hamilton v. Leavy, 117 F.3d 742, 746 (3d Cir. 1997). The requisite state of mind is that of deliberate indifference to the prisoners health or safety. Beers-Capitol v. Whetzel, 256 F.3d 120, 125 (3d Cir. 2001). "'Deliberate indifference' is a subjective standard under *Farmer* -- the prison official-defendant must actually have known or been aware of the excessive risk to inmate safety." Id. Moreover, "[a]ctual knowledge means that 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" Id. at 131, quoting Farmer v. Brennan, 511 U.S. at 837.

Here, plaintiff has brought a failure to protect claim against defendants Everhart, Greenleaf, Patrick, Stickman and Younkin alleging that these defendants failed to protect him from physical injury at the hands of other inmates and failed to respond to his fear that his disability was placing him at risk of assault.[4]  Complaint ¶ 92. Defendants argue that they are entitled to summary judgment because the record is devoid of any evidence to suggest that they were aware of facts from which it could be inferred that a substantial risk of serious harm to

---

[4]Because we have determined that summary judgment in favor of defendant Stickman is properly granted, we have not addressed the parties' remaining arguments insofar as they pertain to him.

plaintiff existed or that the inference was actually drawn by them.[5]  Plaintiff counters arguing that defendants were aware of his fears and the risk of attack because prior to the altercation on December 19, 2005, he had made repeated requests for a handicap cell "for his safety."  Pl. Brief, p. 11.

Plaintiff's assertion, however, is not supported by the record.  Although it appears clear that plaintiff made repeated requests for a handicap cell, none of the requests made prior to December 19, 2005, includes any indication that plaintiff was concerned about or had a fear of being attacked.  To the contrary, plaintiff's request for a handicap cell were based solely on his asserted difficulty moving about a cell shared with another inmate and his concern of falling.  The only references to an assault -- actual or feared -- in an Inmate Request came after the December 19, 2005 incident wherein plaintiff noted that the incident had occurred.  Pl. Exh. 6, pp. 15, 16 (Inmate Requests to Staff Member dated 8/2/06 & 8/4/06).  The other evidence pointed to by plaintiff, including plaintiff's own answers to interrogatories generated in this litigation, simply refer to the same December 19, 2005 incident.  See Pl. Exh. 2, p.5 (Medical Record entry dated 12/19/05 indicating plaintiff has been "involved in an altercation"); Pl. Exh. 19 (Letter from plaintiff dated 2/15/06 to Office of Professional Responsibility noting that he had been attacked on December 19, 2005); Pl. Exh. 20 (Injury Report of 12/19/05 attack); Pl. Exh. 13, ¶ 2a (Plaintiff's Response to Defendant Debra Cutshall's Interrogatories).  This, in our view, does not provide the basis for finding that defendants actually knew or were aware of an

---

[5]Defendants also question whether plaintiff is able to meet the first requirement of showing that his incarceration in a double cell in and of itself posed a substantial risk of serious harm.  Indeed, it appears that the only evidence to support a finding that a risk of harm existed at all is evidence that an altercation occurred on December 19, 2005, during which plaintiff received a laceration on his lip.  Pl. Exh. 2, p.5.

excessive risk to plaintiff's safety.[6]  See Taylor v. Plousis, 101 F. Supp. 2d 255, 269 (D.N.J.

2000) (Finding that the plaintiff's condition as a dual-amputee alone is not sufficient to put

defendants on notice of a serious risk of being attacked by other inmates and that the plaintiff

nevertheless failed to introduce evidence that any defendant consciously disregarded an excessive

risk to his safety).

In an apparent attempt to bolster his failure to protect claim, plaintiff also argues

that he suffered injuries from falling while housed in a non-handicap cell and that he is at

substantial risk of serious injury by his continued placement there because of the difficulty he has

maneuvering around.  Plaintiff's failure to protect claim, however, is premised on defendants'

alleged failure to protect him from physical injury at the hands of other inmates; he has not

alleged an Eighth Amendment violation for failing to protect him from falling.  See Complaint ¶¶

84-94.  Moreover, plaintiff references only one fall -- in June of 2006 -- in his brief and stops

short of suggesting that he suffered a serious injury.  Pl. Brief, pp. 4, 11.[7]  As well, although

plaintiff argues that the risk to his safety is obvious, any difficulty he has maneuvering around his

cell is not the equivalent of being in risk of harm.  Indeed, the record shows that plaintiff

ambulated well with his crutches and had been doing so for two years before he arrived in the

state system.  Def. Exhs. 1, 7; Pl. Exh. 4.  Under these circumstances, there does not appear to be

evidence of record from which a fact finder could reasonably conclude that defendants knew that

plaintiff faced a substantial risk of serious harm or were deliberately indifferent to his safety.

---

[6]Moreover, we note that plaintiff's claim is premised on his assertion that defendants failed to respond to his fear that he was at risk of being assaulted.  Complaint ¶ 92.  Whether or not plaintiff was fearful or whether defendants were aware of plaintiff's fear, however, does not in and of itself suggest that there was an actual risk to his safety or that defendants were aware of that risk.

[7]It is also unclear from the record precisely who was privy to the fact that plaintiff had fallen and, despite plaintiff's contention that he has fallen many times, the court can find reference to only one other fall in the record.  See Pl. Exh. 2, p. 13

Plaintiff has also brought claims against defendants Everhart, Greenleaf, Patrick, Harpster, and Younkin alleging that they were deliberately indifferent to his medical needs by delaying the replacement of his prosthesis and by denying his requests for a handicap cell. Complaint ¶¶ 89, 90.

The deprivation of medical treatment violates the Eighth Amendment's prohibition against cruel and unusual punishment only where it results in unnecessary and wanton infliction of pain or demonstrates a deliberate indifference to the prisoner's serious medical needs. Spruill v. Gillis, 372 F.3d 218, 235 (3d Cir. 2004) (internal quotations and citations omitted). See Estelle v. Gamble, 429 U.S. 97, 103 (1976). The latter standard, which is at issue here, has two components. "First, plaintiff must make an 'objective' showing that the deprivation was 'sufficiently serious,' or that the result of defendant's denial was sufficiently serious. Additionally, the plaintiff must make a 'subjective' showing that defendant acted with 'a sufficiently culpable state of mind.'" Montgomery v. Pinchak, 294 F.3d 492, 499 (3d Cir. 2002), citing Wilson v. Seiter, 501 U.S. 294, 298 (1991). Neither allegations of medical malpractice nor disagreements regarding the proper medical treatment is sufficient to establish a Constitutional violation. Spruill v. Gillis, 372 F.3d at 235. Where, however, "prison authorities deny reasonable requests for medical treatment, and such denial exposes the inmate 'to undue suffering or the threat of tangible residual injury'" or "where 'knowledge of the need for medical care [is accompanied by the] ... intentional refusal to provide that care' ... the deliberate indifference standard has been met." Monmouth County Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326, 346 (3d Cir. 1987), quoting Westlake v. Lucas, 537 F.2d 857, 860 (6th Cir. 1976), and Ancata v. Prison Health Services, Inc., 769 F.2d 700, 704 (11th Cir. 1985). See Spruill v. Gillis, 372 F.3d at 235.

Defendants contend that plaintiff's deliberate indifference claims against defendants Everhart, Patrick, and Harpster are subject to summary judgment because, as non-medical personnel, they cannot be found deliberately indifferent for failing to defer to plaintiff's judgment regarding his care when the medical personnel's determination was to the contrary. Defendants also suggest that plaintiff is otherwise unable to establish that the delay in receiving a new prosthesis was sufficiently serious to support a finding of deliberate indifference given the fact that, by plaintiff's own admission, he had been without the use of his old prosthesis for approximately two years while he was incarcerated at the Allegheny County Jail prior to his transfer to SCICH.

Plaintiff has not addressed defendants' arguments regarding the delay in replacing his prosthesis and therefore, as before, has seemingly waived the issue. See Ankele v. Hambrick, 286 F. Supp. 2d at 496; McHenry v. County of Delaware, 2005 WL 2789182 at *13 n.12. Further, it not only appears that the replacement of his prosthetic leg was being handled by the medical staff and outside the purview of Everhart, Patrick, and Harpster, but the number of months that plaintiff was without a prosthesis after being transferred from the ACJ cannot have caused him undue suffering when plaintiff had already been without a prosthesis for the two previous years and he does not dispute that he ambulated well on crutches. See Def. Exhs. 1, 2, 8; Pl. Exhs. 5, 8. See Spruill v. Gillis, 372 F.3d at 236 ("Absent a reason to believe ... that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official ... will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference").

Moreover, review of the record shows that after plaintiff was transferred to the state system efforts were made to repair his old prosthesis and, when that proved unfruitful and it

was determined that the leg had been lost, arrangements were made to provide plaintiff with a new prosthesis. To that end, estimates were obtained, plaintiff was seen by an outside consultant and fitted for a new prosthesis, and a new prosthetic leg was, in fact, constructed for him. Although the process may have taken longer than plaintiff would have liked, or even longer than it should have taken, these facts appear to preclude a finding that defendants were deliberately indifferent to a serious medical need.

Defendants also contend that Everhart, Patrick, and Harpster cannot be charged with deliberate indifference to plaintiff's requests for a handicap cell because the decision of whether or not to place plaintiff in a handicap cell a was a medical issue and there is no evidence of record to support a finding that their mental state was such that deliberate indifference could be established as to them. Plaintiff does not specifically address defendants' argument in his responsive brief but, rather, simply points generally to the various requests he made for a handicap cell and the grievances he filed when those requests were denied. Whether or not these defendants were privy to plaintiff's requests and/or grievances, however, does not speak to defendants' argument that plaintiff's request for a handicap cell was a medical issue and that the medical staff consistently determined that plaintiff's disability did not warrant a handicap cell.[8]

---

[8] Moreover, to the extent that plaintiff has argued elsewhere in his pleadings that the defendants have the ability to override medical orders and make their own housing assignments, plaintiff has not accurately represented the record. For instance, on page 7 of the Factual History section of his brief, plaintiff represents that, "SCI Houtzdale staff may override the medical orders," citing to Exhibits 23 at pages 78-79, and Exhibit 14 at pages 29-33, as providing the requisite support. Exhibit 23, however, is the deposition testimony of Everhart in which he states: "I don't know if I can overrule a medical order. If it's a medical order, we would have to comply with that and then discuss it with the medical department and try to come to terms with how we can address it." He then stated that any concerns about a medical order were relayed to the health care administrator, who would discuss the situation with the medical department and that he would be then apprized of the resolution. When asked whether he would carry out the resolution as determined by the health care administrator and the medical department, Everhart responded, "Absolutely, yes." Pl. Exh. 23, pp. 78-79. Similarly, Harpster merely testified that given his understanding that it had already been determined that plaintiff did not need a handicap cell he questioned the "Block Memo" he received, apparently authorizing a handicap cell for plaintiff, and

Under these circumstances, it appears that defendants Everhart, Patrick and Harpster are entitled to summary judgment on this issue as well.

With respect to the medical defendants, Greenleaf and Younkin, defendants argue that the record undermines any claim of deliberate indifference to plaintiff's medical needs as evidenced by the fact that plaintiff's requests for a handicap cell were evaluated on numerous occasions and that it was consistently determined that plaintiff did not have a medical need for a handicap cell. Plaintiff has responded by pointing to the numerous requests he made for a handicap cell and the numerous grievances he submitted citing the difficulties he had maneuvering in a double cell. Because his requests were denied, plaintiff concludes that defendants were deliberately indifferent to his medical needs. We disagree.

The mere fact that defendants were aware that plaintiff was disabled and denied his requests for a handicap cell does not, standing alone, suggest that plaintiff was, in fact, in need of a handicap cell or that defendants deliberately disregarded that need. Indeed, the record shows that when plaintiff was transferred to SCIH in August of 2004, he had already been without a prosthesis for two years and was ambulating well with crutches. Def. Exhs. 1, 7. Consequently, he was given bottom bunk, bottom tier status and cleared for work that did not

---

reviewed it with medical department to ensure its accuracy. Pl. Exh. 14, pp. 29-33. As such, neither record reference supports plaintiff's conclusion that the staff at SCIH may override medical orders. Further, although in his Counter Statement of Material Facts, plaintiff points to the responses to requests for admissions submitted by defendants Harpster, Patrick and Everhart as evidence of their mental state for purposes of establishing deliberate indifference, review of their responses does not appear to support such a finding either. See Pl. Exh. 10 ¶¶ 1-2, 9-11, 21-25; Pl. Exh. 29 ¶¶ 1-2, 18-19; Pl. Exh. 30 ¶¶ 1-2, 6. The fact that defendants regarded plaintiff has an individual with a disability does not by itself suggest that plaintiff was in need of a handicap cell or that they were deliberately indifferent to plaintiff's medical needs. Moreover, while Everhart and Harpster allowed that they did not need a medical order to place an inmate in a handicap cell, when their testimony is read in context it is clear that they were referring to general housing assignments when medical concerns are not at issue. Indeed, Everhart went on to state that when an inmate claims a medical need for a handicap cell then a medical order "becomes an issue." Pl. Exh. 29 ¶ 19.

require prolonged standing. Def. Exh. 7. The Progress Notes show that approximately five weeks later, on October 1, 2004, plaintiff requested that his bottom bunk status be renewed. That request was granted and his bunk status was continued for 180 days. Id. In the interim, it appears that plaintiff had been referred to an outside consultant and on October 25, 2004, was fitted for a new prosthesis which he received in February of 2005. Def. Exhs. 2; 3, pp. 15-17; 7; 8; Pl. Exh. 2, p. 4.

It also appears that each request for a handicap cell submitted by plaintiff was reviewed. Because of plaintiff's apparent ability to ambulate with crutches and, later, because he had a prosthesis available to him, it was consistently determined that a handicap cell was not medically necessary. See Pl. Exhs. 2, pp. 3, 5, 7, 8, 9, 10, 11, 12; Pl. Exh. 6, pp. 5, 7, 10, 15, 16. While plaintiff takes issue with defendants' conclusion in this regard, as previously discussed, a disagreement as to the proper treatment, even if the treatment given is ill advised or rises to the level of medical malpractice, is not sufficient to establish a claim of deliberate indifference. Spruill v. Gillis, 372 F.3d at 235.

Moreover, plaintiff's suggestion that the prosthesis was, in essence, unavailable because it caused him pain is unpersuasive. Not only did Michael Virostek, who evaluated plaintiff to determine the what type of prosthetic leg would be most appropriate for him, explain to plaintiff that the prosthesis would take getting used to because plaintiff had not walked on a prosthesis for a long period of time, but plaintiff himself acknowledged that a new prosthesis (even one like his old one) would be painful until he adapted to it. Pl. Exh. 15, p. 1. Moreover, plaintiff reported on April 11, 2005 that it felt better after adjustments were made. See Pl. Exh. 2, p. 4; Def. Exh. 3. Plaintiff then asked for a further adjustment which was apparently made, yet shortly thereafter, plaintiff refused to accept the prosthesis. Pl. Exh. 2, pp., 4, 5. Even two years

later, defendants' offer to schedule plaintiff with Dr. Naji to "reoffer" the prosthesis and have it refitted were apparently rejected as well.  See Pl. Exh. 2, p. 9.  Under these circumstances, it cannot be said that defendants were deliberately indifferent to plaintiff's medical needs.[9]

In this manner, Muhammad v. Department of Corrections, 2008 WL 4911876 (D.N.J. Nov. 12, 2008), upon which plaintiff principally relies, is easily distinguishable. Although Muhammad was also an amputee, his Eighth Amendment claim was premised on his transfer from a handicapped-accessible cell on the first floor to an upper-level bunk of a second floor cell with limited access to the handicapped-accessible shower facilities.  The undisputed evidence not only showed that accessing the upper bunk of his new cell caused the plaintiff great pain to his leg and back but that he was essentially unable to take showers at all because he was incapable of using the regular showers on the second floor and was unable to access the handicapped-accessible showers on the first floor.  The Court found this evidence was sufficient to create an issue for trial as to whether the defendants acted with deliberate indifference in subjecting plaintiff to these deprivations.

Here, the deprivations alleged by plaintiff are far less compelling as he claims only that his ability to maneuver around his cell is impeded.  Moreover, not only has plaintiff been given lower bunk, lower tier status but there is no evidence that he is unable to shower or otherwise care for himself.  Indeed, the Progress Notes submitted by plaintiff show that he has access to handicap showers.  Pl. Exh. 2, p. 9.

---

[9]The court also notes that in addition to plaintiff's apparent unwillingness to work through the alleged difficulties he was having with the new prosthesis, he often requested a "single cell" as opposed to a "handicap cell," citing to the fact that using crutches irritated his cellmates; that his cellmate is indifferent to his disability; that he didn't get along with his cellmate; and that he is bothered by a cellmate who blasts his television all day and snores all night.  See Def. Exhs. 10, 12; Pl. Exh. 2, pp. 3, 5, 8, 9, 12; Pl. Exh. 6, p. 10. These facts only lend credence to defendants' apparent suspicions that plaintiff simply wanted a single cell, rather than one to benefit his disability, and that by refusing the prosthesis, he would then be given a single/handicap cell.  See Pl. Exh. 2, p. 7; Pl. Exh. 6, pp. 10, 15.

Defendants also argue that they are entitled to summary judgment on plaintiff's claims brought under the ADA in which he has alleged that defendants' failure to replace his old prosthetic leg with an equivalent prosthesis denied him meaningful access to, and the benefits of, exercise equipment, job opportunities and the prison dining facilities, and that defendants' failure to accommodate his disability by denying his requests for a handicap cell denied him meaningful access to the toilet, sink and shower, interfered with his ability to dress himself, and posed a threat to his physical safety. Complaint ¶¶ 85, 86.

Under Title II of the ADA, "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. In order to establish a violation under Title II, plaintiff must demonstrate: (1) that he is a qualified individual; (2) with a disability; and (3) that he was denied the opportunity to participate in or benefit from the services, programs, or activities of a public entity, or was otherwise subject to discrimination by that entity; (4) by reason of his disability. Bowers v. National Collegiate Athletics Association, 475 F.3d 524, 553 n.32 (3d Cir. 2007).

Defendants do not dispute that plaintiff is a qualified individual or that he is disabled but, rather, contend that they are entitled to summary judgement on plaintiff's ADA claims because they have, in fact, provided plaintiff with reasonable accommodations for his disability. Specifically, with respect to plaintiff's assertion that he has been denied meaningful access to programs and services because defendants failed to replace his old prosthesis with an equivalent one, defendants argue that the prosthesis that was provided to plaintiff is sufficient to permit plaintiff to access any programs and services and that it is plaintiff's own refusal to use the prosthesis that has denied him the cited benefits.

To support their position, defendants point to the fact that plaintiff was referred for a consult with Tuefels, an outside orthopedic appliance vendor, by Dr. Laskey and that plaintiff was, in fact, evaluated by Michael Virostek, a representative from Tuefels, in order to assess the type of functionality plaintiff needed and determine the type of leg to build for plaintiff.  Def. Exh. 2.  Indeed, Mr. Virostek testified that, although he understood that plaintiff had a "hydraulic knee system" in the past, he thought that the "single axis safety" knee he provided was more appropriate because plaintiff had not walked on a prosthesis for a long period of time.  Mr. Virostek testified that the knee was "stance weight activated," and would allow plaintiff "to do just about anything he needed to do in the prison," and was safer for him given the fact that he hadn't walked in a while.  Def. Exh. 3, pp. 15-17, 39.  Mr. Virostek allowed that a lot of patients are fearful of getting a new prosthesis because no two sockets are exactly the same, they need to be broken in, and because its "not going to feel exactly like the one he had before" due to residual limb changes.  Id. at p. 33.  Indeed, Mr. Virostek testified that plaintiff had not only expressed some concern to him about breaking in a new prosthesis since he hadn't walked in a long period of time but plaintiff acknowledged that he "would have to try it," and that he would "have to get used to it."  Moreover, Mr. Virostek did not recall plaintiff ever telling him that the new prosthesis hurt him or that he couldn't wear it but, rather, plaintiff reiterated to him that he would have to try it.  Id.  Mr. Virostek also allowed that while a safety knee is a little less fluid than a hydraulic knee because it "really makes sure you get that knee extended," and is all done "more mechanically," he testified that it is safer and that the friction of the swing can nevertheless be adjusted.  Id. at pp. 38-39.  Although Mr. Virostek testified that it is a little easier to go up and down hills with an hydraulic knee, he also testified that hills are hard no matter what type of knee is used.  Id. at p. 39.  Mr. Virostek also stated that he observed plaintiff sitting,

standing and walking with the new prosthesis and that he didn't do "too bad" considering it had been a while since he walked with a prosthesis and had been functioning with one leg. Id. According to Mr. Virostek, he saw plaintiff a total of three or four times including once to make an adjustment and then didn't hear anything further. Id. at 34. Finally, when asked whether Tuefels' contract with the DOC imposed any limitations on the type of products that could be used to build a prosthesis, Mr. Virostek testified that there is a power knee that costs $100,000 that the DOC would probably not agree to pay for, and that any prosthesis with a part that was sharp or could be used as a weapon was unlikely to be approved. Id. at p. 58.

This evidence, in our view, amply supports defendants' position that plaintiff was provided with a reasonable accommodation for his disability. Plaintiff was not only evaluated and fitted for a new prosthesis but was given one that the outside orthopedic vendor determined would be safer for plaintiff and allow him to do "just about anything he needed to do." Indeed, plaintiff has not pointed to any evidence to support a finding that he is still unable to access exercise equipment and the dining facilities or take advantage of job opportunities with the new prosthesis but complains only that his preference for a hydraulic knee was not taken into consideration and that it is difficult for him to negotiate hills with the safety knee. Whether or not plaintiff received precisely the prosthesis he would have preferred, however, does not speak to whether the prosthesis he provided to him permits him to access programs and receive benefits. See Douris v. Bucks County Office of District Attorney, 2004 WL 1529169 at *8 (E.D. Pa. July 6, 2004), citing Olmstead v. Zimring, 527 U.S. 581, 602 (1999) (Finding that the ADA does not compel defendants to provide plaintiff with the accommodation of his choosing). see also Foreman v. Bureau of Prisons, 2007 WL 108457 at *4 (3d Cir. Jan. 1, 2007) (Rejecting the

plaintiff 's Eighth Amendment claim where the prison had provided him with a shower chair even though it was not the specific type the plaintiff felt was appropriate for him).

Moreover, to the extent that plaintiff has suggested that the new prosthesis is an unreasonable accommodation because it is inferior to his old one and because it hurts and makes it difficult to go up and down hills, it is undisputed that a new prosthesis takes time to get used to and that plaintiff's requests to have the leg adjusted were granted.[10]  Yet, plaintiff refused to use the prosthesis after only three months and continues to rebuff any offers to have the leg refitted. In addition, plaintiff has not offered any evidence to dispute Mr. Virostek's testimony that walking up and down hills is difficult no matter what type of knee is used.  Plaintiff's inability to meaningfully access programs, services and activities, therefore, appears to stem from his decision not to accept the accommodation offered to him and not because defendants failed to accommodate him in the first instance.  Indeed, the law requires only that defendants provide accommodations that would allow plaintiff to participate in the desired programs; the court has found no cases, and plaintiff has not provided the court with one, which stand for the proposition that plaintiff is entitled to whatever accommodation he desires.  Id.  See Henrietta D. v. Bloomberg, 331 F.3d 261, 282 (2nd Cir. 2003), citing Alexander v. Choate, 469 U.S. 287, 301 (1985) ("A 'reasonable accommodation' is one that gives the otherwise qualified plaintiff with disabilities 'meaningful access' to the program or services sought").  See also Fink v. N.Y. City Department of Personnel,  53 F.3d 565, 567 (2d Cir. 1995) (Finding that the government is not required to provide every accommodation requested so long as the accommodation provided is reasonable").

---

[10]Moreover, although plaintiff suggests that he wanted a leg like his old leg because it did not cause him pain, plaintiff appears to acknowledge that even if the new prosthesis had been like his old one, he would still have been in pain simply because it was new and not yet broken in and because he had not walked with a prosthesis for three years.  See Pl. Exhs. 1, p. 5; 15, p.1.

Further, plaintiff has not pointed to any evidence which would suggest that defendants provided him with an inferior leg "by reason of his disability." Indeed, plaintiff has repeatedly suggested that the DOC declined to provide him with a prosthetic equivalent to his old one because they only provide one type of prosthesis and the old one would be too expensive to duplicate. See CMF ¶¶ 44, 80, 82-84, 93. See Forestier Fradera v. Municipality of Mayaguez, 440 F.3d 17, 23 (1st Cir. 2006) (Rejecting the plaintiff's claim that the defendants' failure to accommodate him was "by reason of his disability" in light of the plaintiff's deposition testimony attributing the delay to his membership in a particular political party). See also Brown v. Pa. Department of Corrections, 290 Fed. Appx. 463, 467 (3d Cir. 2008) (Granting summary judgment on the plaintiff's ADA claim where he had failed to allege sufficient facts to show that he was denied access to mental health treatment "by reason of" his disability). Under these circumstances, plaintiff's claim brought under the ADA concerning defendants' failure to replace his prosthesis with an equivalent model appears subject to summary judgment.[11]

As previously discussed, plaintiff has also alleged in the complaint that defendants' failure to accommodate his disability by denying his requests for a handicap cell violated Title II of the ADA as it denied him meaningful access to the toilet, sink and shower, interfered with his ability to dress himself, and posed a threat to his physical safety. Complaint ¶ 86. Plaintiff, however, has not alleged that he has been precluded from participating in a service,

---

[11]Plaintiff also eludes to an argument in his brief that the delay in receiving the new prosthesis was violative of the ADA and RA because he was denied access to programs and services in the interim. Plaintiff, however, has not alleged in his complaint that any delay in receiving his prosthesis violated the ADA or RA. Nor has he pointed to any evidence from which it could be found that any delay was "by reason of his disability," or that the period of time it took to receive the new prosthesis was excessive, given his transfers and the time it took to get estimates on repairing his old prosthesis and obtaining a new one, getting him referred him to an outside consultant, having him evaluated, and the time for the actual construction. See Forestier Fradera v. Municipality of Mayaguez, 440 F.3d at 22-23 (Finding no basis in the record to conclude that the 6 year delay in effectuating the accommodation was because of plaintiff's disability rather than red tape).

program, or activity because of defendants' failure to accommodate him with a handicap cell.

See Bowers v. National Collegiate Athletics Association, 475 F.3d at 553 n.32. Rather, plaintiff alleges that, by denying his request for accommodation, i.e., a handicap cell, defendants have failed to attend to his medical needs. Defendants' alleged failure to attend to his medical needs, however, fails to state a claim under Title II of the ADA.

In Bryant v. Madigan, 84 F.3d 246, 248 (7th Cir. 1996) ("Bryant"), the plaintiff, a paraplegic inmate who suffers from leg spasms, brought suit against the prison under Title II of the ADA for refusing his request to have guardrail installed on his bed after a spasm caused him to fall out of bed resulting in a broken leg. The Court of Appeals for the Seventh Circuit rejected Bryant's claim finding that:

> the Act would not be violated by a prison's simply failing to attend to the medical needs of its disabled prisoners. No discrimination is alleged; Bryant was not treated worse because he was disabled. His complaint is that he was not given special accommodation. Unlike the prisoner plaintiffs in Love v. McBride, 896 F.Supp. 808 (N.D.Ind.1995), or Donnell v. Illinois State Bd. of Education, 829 F.Supp. 1016, 1020 (N.D.Ill. 1993), he is not complaining of being excluded from some prison service, program, or activity, for example an exercise program that his paraplegia would prevent him from taking part in without some modification of the program. He is complaining about incompetent treatment of his paraplegia. The ADA does not create a remedy for medical malpractice.

> Standards of medical care are not irrelevant to the statute. Disabled people often cannot participate in programs and activities unless special attention is given to their medical needs. But incarceration, which requires the provision of a place to sleep, is not a "program" or "activity." Sleeping in one's cell is not a "program" or "activity." Even apart from the prison setting it would be extremely odd to suppose that disabled persons whose disability is treated negligently have a federal malpractice claim by virtue of the Americans With Disabilities Act, whereas a sick or injured but not disabled person-a person suffering from an acute viral infection, perhaps, or who has broken his leg, or who has a hernia or an inflamed gall bladder-must be content with the remedy that the state law of medical malpractice provides. Moreover, the

> courts have labored mightily to prevent the transformation of the
> Eighth Amendment's cruel and unusual punishments clause into a
> medical malpractice statute for prisoners. We would be
> exceedingly surprised to discover that Congress had made an end
> run around these decisions in the Americans With Disabilities Act.

Id. at 249.

Similarly, in this case, using the toilet, sink and shower facilities or being able to dress oneself, are not programs or activities as contemplated by Title II of the ADA any more than sleeping is. While denying plaintiff a handicap cell so that he has access to handrails and push-on sink levers may constitute denial of medical treatment,[12] it does not constitute a violation of Title II of the ADA. Id. See Iseley v. Beard, 200 Fed. Appx. 137, 142 (3d Cir. 2006) (Citing to Bryant approvingly and finding that Iseley had not claimed that he was excluded from any program on the basis of his disability but rather alleged "that he was denied medical treatment for his disabilities, which is not encompassed by the ADA's prohibitions"). As such, it appears that defendants are entitled to summary judgment on plaintiff's claim that defendants' failure to accommodate his disability by denying his requests for a handicap cell violated Title II of the ADA as well.

Plaintiff also brings his claims of failure to accommodate under the RA. Defendants argue, without citation to any authority, that they are entitled to summary judgment on these claims because the RA, although substantially similar to the ADA, imposes the additional requirement that the program or activity in question receive federal financial assistance and because the DOC does not receive financial assistance *for any of the programs or activities* of which plaintiff complains, the RA does not create any liability.

---

[12]Indeed, it is undisputed in this case is that an inmate's request for a handicap cell because of a disability is a medical issue.

The Supreme Court, however, "has made clear that Title II of the ADA applies to state prisons and the services they provide to prisoners, including 'medical services.'" <u>Koslow v. Commonwealth of Pennsylvania</u>, 302 F.3d at 171. <u>See</u> <u>Scherer v. Pennsylvania Department of Corrections</u>, 2007 WL 4111412 at *43 (W.D. Pa. 2007), <u>quoting</u> <u>Pennsylvania Dept. Of Corrections v. Yeskey</u>, 524 U.S. 206, 209-210 (1998). Thus, defendants' attempt to differentiate between the DOC itself and the programs and services it provides must fail. The court nevertheless notes that because the RA is otherwise indistinguishable from the ADA, the court's above findings with respect to the ADA are equally applicable to plaintiff's claims brought under the RA. <u>Pennsylvania Protection and Advocacy, Inc. v. Pennsylvania Dept. of Public Welfare</u>, 402 F.3d 374, 379 n.3 (3d Cir. 2005) (Noting that because of the similarities between the statutes, the Court of Appeals for the Third Circuit has found that they are appropriately considered in tandem). <u>See</u> <u>Wagner by Wagner v. Fair Acres Geriatric Center</u>, 49 F.3d 1002, 1009 (3d Cir. 1995) (To succeed under the RA, a plaintiff must show: (1) that he has a disability for purposes of the Rehabilitation Act; (2) that he was "otherwise qualified" for the benefit that has been denied; (3) that he has been denied the benefits "solely by reason" of his disability; and (4) that the benefit is part of a "program or activity receiving Federal financial assistance"). As such, it appears that plaintiff's claims brought under the RA are subject to summary judgment for the same reasons as plaintiff's ADA claims.

Plaintiff has also brought a claim under § 12203(b) of the ADA alleging that defendants have failed to accommodate him with a handicap cell in retaliation for refusing to accept the new prosthesis. Complaint ¶ 88. Defendants argue that they are entitled to summary judgment on this claim as well since the evidence shows that plaintiff's housing needs were assessed on August 23, 2004, when he was transferred to SCIH, and it was determined at that

time that a handicap cell was not warranted.  Because plaintiff did not refuse the new prosthesis until February of 2005,[13] well after his housing status had been determined, the decision to deny him a handicap cell could not have been in retaliation for refusing to accept the new prosthetic.

Although plaintiff has alleged that defendants' refusal to provide him with a handicap cell constitutes retaliation, plaintiff has actually brought his claim under the anti-coercion provision of the ADA which provides:

> It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed ... any right granted or protected by this chapter.

42 U.S.C. § 12203(b).[14]  Although not alleged in his complaint, plaintiff argues in his present brief that he has a right under the ADA not to accept a particular accommodation,[15] and that defendants' actions in denying him a handicap cell is, in fact, an attempt to coerce him into accepting the accommodation of a prosthetic leg in violation of § 12203(b).  We disagree.

Plaintiff has not pointed to any evidence to support the conclusion that defendants are denying him a handicap cell in order to coerce him into accepting the prosthetic leg.  To the contrary, the record shows that plaintiff made numerous requests for a handicap and/or single cell both before and after he refused the prosthesis and that those requests were consistently denied

---

[13]Actually, the record shows that plaintiff received the new prosthesis in February of 2005, but did not refuse it until May of 2005.  Pl. Exh. 2, pp. 4, 5.

[14]In contrast, the anti-retaliation provision provides: "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."  42 U.S.C. § 12203(a).

[15]Plaintiff relies on 28 C.F.R. § 35.130(e)(1), misidentified in his brief as § 35.130(e)(2), which provides that: "Nothing in this part shall be construed to require an individual with a disability to accept an accommodation, aid, service, opportunity, or benefit provided under the ADA or this part which such individual chooses not to accept."

based on the medical determination that he did not warrant a handicap cell.  The fact that it was pointed out to plaintiff in answer to his subsequent requests for a handicap and/or single cell that a prosthesis was available to him, does not all of a sudden render the medical determination that he did not meet the criteria for a handicap cell pretext in order to coerce plaintiff into accepting another accommodation.

Moreover, it appears more likely from plaintiff's argument that he is not required to accept the prosthesis provided to him while at the same time complaining that he is being denied a single and/or handicap cell, that it is plaintiff who is attempting to coerce the DOC into giving him the accommodation of his choosing, which the regulation does not require defendants to provide.  See Douris v. Bucks County Office of the District Attorney, 2004 WL 1529169 at *8, citing Olmstead v. Zimring, 527 U.S. at 602 ("The regulation does not compel Defendants to provide Plaintiff the accommodations which he chooses.  Rather, it prohibits Defendants from compelling Plaintiff to take advantage of the accommodation that have [sic] been offered").

Finally, plaintiff has brought a claim alleging that defendants' policy for granting accommodations, specifically cells, to people with disabilities violates § 12132 of the ADA. Complaint ¶ 87.  Review of plaintiff's brief and the record suggests that defendants are entitled to summary judgment on this issue as well.[16]

---

[16]Although defendants have not addressed this issue in their motion for summary judgment, the court has the power to *sua sponte* grant summary judgment so long as the losing party has notice and an opportunity to be heard.  Canell v. Bradshaw, 97 F.3d 1458 (9th Cir. 1996)(Table), 1996 WL 547978 at *5 (9th Cir. Sept. 25, 1996) ("A district court may grant summary judgment to a non-moving party sua sponte so long as the other party has had an adequate opportunity to address the relevant issues").  See also Celotex, 477 U.S. at 326 ("Our conclusion is bolstered by the fact that district courts are widely acknowledged to possess the power to enter summary judgments sua sponte, so long as the losing party was on notice that she had to come forward with all of her evidence").  Because plaintiff has addressed the issue in his responsive brief, notwithstanding defendants' failure to do so, he has clearly had the opportunity to be heard, thereby permitting the court to do address the issue as well.

First, plaintiff has not alleged that he has been denied participation in any program or activity as the result of defendants' allegedly discriminatory policy but, rather, claims that he has been denied the accommodation he seeks, i.e., being placed in a handicap cell. At best, plaintiff is claiming that he received incompetent treatment for his disability -- neither of which suggests discriminatory treatment in violation of Title II of the ADA. See Spruill v. Gillis, 372 F.3d at 235; Bryant v. Madigan, 84 F.3d at 248; Iseley v. Beard, 200 Fed. Appx. at 142.

Further, it appears that plaintiff is trying to spit and whistle at the same time having simultaneously argued that the Policy instituted by the DOC, see Pl. Exh. 31, regarding placement in handicap cells is discriminatory and that defendants should be faulted for failing to adhere to it. This notwithstanding, plaintiff has not supported his claims with any argument as to how these alleged failures violate the ADA. Rather, plaintiff has merely made a series of one sentence complaints regarding the adequacy of the Policy or the manner in which it is effectuated and then simply concludes that, because he is disabled, defendants must have discriminated against him. Plaintiff's complaints about the Policy and the conclusions that he draws from the alleged deficiencies, however, are largely unsubstantiated by his citations to the record. Indeed, plaintiff's brief is replete with unwarranted inferences and misrepresentations.

For instance, plaintiff concludes that the Policy is discriminatory because it contains no written criteria on how to evaluate an accommodation; that Younkin, who was the Facility Disability Accommodation Coordinator, failed to provide him with a written statement as to why he was being denied a handicap cell; that she didn't have the authority to issue a handicap cell; and that she encouraged the medical department not to provide plaintiff with a handicap cell. Pl. Brief, p. 25-26.

Plaintiff, however, has not pointed to anything in the ADA that requires a public entity to set forth written criteria on evaluating possible accommodations and has not suggested how the absence of such criteria is discriminatory.[17]  Nor has plaintiff suggested how Younkin's failure to provide him with a written statement explaining why he was denied a handicap cell or her inability to issue an order regarding his cell placement is violative of the ADA.  Indeed, review of the record shows that rather than provide plaintiff with a written statement, Younkin "called him up and spoke to him in person," and that while she could not independently write an order for a handicap cell, which only a doctor or a physicians assistant could do, she was able to refer an inmate for an evaluation for a handicap cell which plaintiff had on more than one occasion.  Pl. Exh. 33, pp. 30-31.  In addition, contrary to plaintiff's representation, Ms. Younkin did not testify that she encouraged the medical department not to provide plaintiff with a handicap cell.  Rather, when asked whether she had advised Ms. Hoover that plaintiff did not need a handicap cell, she replied, "No."  Pl. Exh. 33, p. 86.  She then went on to further explain her answer stating that she had discussed with Ms. Hoover at the time the fact that there were no new medical issues or changes in his medical condition and that he had a reasonable accommodation having been given bottom bunk, bottom tier status.  Id.

In addition, although plaintiff complains that defendants have failed to follow the provisions of the Policy that provide for rearrangement of the furniture and keeping a roster of individuals with disabilities, he has not pointed the court to any such provisions in the Policy nor has the court been able to find any.  Moreover, plaintiff has not suggested how defendants' failure to abide by these phantom provisions is discriminatory.  Although somewhere in the Policy it may provide that any staff member may take an accommodation request from an inmate,

---

[17]Moreover, given the myriad of potential disabilities and accommodations that could be considered, it would appear unrealistic to impose such a requirement.

plaintiff has not explained how the Corrections Health Care Administrator's failure to train the staff on the ADA has impacted their ability to take an accommodation request nor explained how it impacted plaintiff. Indeed, plaintiff has not alleged that he made an accommodation request that was not addressed but complains only that he did not get the accommodation he wanted.

In another example, plaintiff complains that the Regional Deputy Secretary allegedly failed to review his request for accommodation but does not provide the court with any basis for his conclusion that the Secretary's failure to do so was discriminatory or had any consequences at all. Plaintiff has offered no evidence that requests by other inmates were reviewed by the Regional Deputy Secretary or that inmates with similar disabilities and functional capacities were granted an accommodation by the Regional Deputy Secretary.

Although this is just a sampling of plaintiff's remarks regarding the DOC Policy regarding reasonable accommodations, the remainder of his complaints and inferences are similarly unsupported. While it may be that hidden amongst his assertions is one that has some support in the record, the court is unwilling to comb through the myriad of exhibits that plaintiff has simply cited to generally or look elsewhere in the record to find that support. Nor is it up to the court to surmise how these alleged deficiencies have impacted plaintiff or have otherwise run afoul of the ADA. See United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991)("Judges are not like pigs, hunting for truffles buried in briefs.")

Having found that plaintiff is unable to sustain his ADA, RA and the Eighth Amendment claims, it appears that only his state law claims remain. Where all claims over which the court has original jurisdiction have been dismissed, the district court may decline to exercise supplemental jurisdiction over the remaining claims. 28 U.S.C. § 1367(c)(3). Although declining to exercise jurisdiction is within the discretion of the district court, the court of Appeals

for the Third Circuit has held that absent extraordinary circumstances the court should decline to exercise pendent jurisdiction where the federal claims are no longer viable.  <u>Bright v. Westmoreland Co.</u>, 380 F.3d 729, 751 (3d Cir. 2004).  Because there does not appear to be any extraordinary circumstances surrounding this case which would warrant the exercise of supplemental jurisdiction over plaintiff's state law claims it appears that these claims are properly dismissed as well.

        D.    <u>Conclusion</u>

For these reasons it is respectfully recommended that defendants' motion for summary judgment [Dkt. 73] be granted.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) & (C), and Local Rule 72.1.4 B, the parties are permitted to file written objections and responses thereto in accordance with the schedule established in the docket entry reflecting the filing of this Report and Recommendation.  Failure to timely file objections may constitute a waiver of any appellate rights.

        Respectfully submitted,

        <u>/ s/  *Amy Reynolds Hay*</u>
        United States Magistrate Judge


Dated: 23 April, 2009


cc:    The Honorable Kim R. Gibson
       United States District Judge

       All counsel of record by Notice of Electronic Filing